Green v. The State.

## GREEN v. THE STATE.

1. CRIMINAL PRACTICE: *Discharging prisoner.*
   A prisoner convicted of murder in the second degree when he should
   have been convicted of murder in the first degree, cannot claim to be
   discharged upon the ground that he has been acquitted of the crime
   of which he was actually guilty.

2. MURDER: *Motive, proof of, not essential to conviction.*
   Proof of a motive for committing a murder is not essential for the
   conviction of the murderer in a case depending upon circumstantial
   evidence.

3. PRACTICE: *Giving papers to Jury.*
   It is the better practice not to give to the jury in a criminal case, upon
   retirement, an indictment on which is endorsed a verdict of guilty
   at a former trial.

4. INSTRUCTION: *Reasonable doubts, etc.*
   An instruction "That in cases of circumstantial evdence, before the
   jury can convict, the guilt of the accused must be made out not only
   beyond a reasonable doubt, but to the exclusion of every other
   reasonable hypothesis," should not be given; either one is sufficient.

5. BILL OF EXCEPTIONS: *Its province.*
   It is the province of a bill of exceptions not only to bring upon the
   record facts which would not otherwise appear, but rulings of the
   court on questions of law, and exceptions to them, in order to have
   them reviewed in the Supreme Court.

6. PRACTICE: *Order of argument, etc.*

The order of argument where several counsel are engaged, the subjects, length, and range, of their discourses before a jury, must necessarily be left to the discretion of the presiding judge, and unless the bill of exceptions shows an abuse of the discretion, it will not be reviewed here.

7. SAME: *Furnishing prisoner with list of jurors.*

The Code of Criminal Practice makes no provision for furnishing to the prisoner a list of the jurors before going into the trial.

8. SAME: *Evidence of a deceased witness.*

The evidence of a witness on a former trial, since deceased, may be proven on a subsequent trial for the same offense.

APPEAL from *Pulaski* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Blackwood & Williams*, for appellant:

1. The jury, from the evidence, should have found appellant guilty of murder in the first degree or acquitted him. If appellant murdered the deceased at all, it was a malicious premeditated murder *by lying in wait*, and was *murder in the first degree* under our Statute.

2. It was error to overrule the motion for continuance. The discretion of the court below was a *legal* discretion, and when *abused* will be reviewed by this court. *Thompson* v. *The State*, 26 *Ark.*, 327. The motion showed all the law required. *Acts of* 1879, *p.* 26.

3. The testimony of Garner and Cavin should have been excluded. Evidence of a conversation, said to have taken place long prior to the homicide, was incompetent and irrelevant. No foundation was laid for the evidence of Cavin.

4. Crabbe's testimony relating to what Haskins said about the tracks should have been excluded. Extra judicial confessions, made by silence or acquiesence, are dangerous and liable to the greatest abuse. Even *admissions* by

38–38

· acquiesence, in civil cases, are regarded as the weakest kind of evidence, and received with great caution. 1 *Greenleaf Ev.,* secs. 197, 199, 213, 214. Crabbe was contradicted by Turnbough in every material particular.

5. It was error to permit the prosecuting attorney to cross-examine Amanda and Toney Green on matter not called out or referred to in their examination in chief. 1 *Greenleaf Ev.,* sec. 445 ; *Phil. & Trenton R. Co.* v. *Stimpson,* 14 *Peters,* 448, 461.

6. The jury should not have been allowed to take with them the papers mentioned in the motion for a new trial. *Sec.* 1972, *Gantt's Dig.* The former verdict is not to be used in *evidence* or *referred* to in argument. No papers should go to a jury except such as are produced in evidence. 16 *Ark.,* 290 ; 29 *Ib.,* 268 ; *Kilten* v. *Sistrunk,* 7 *Ga.,* 294 ; *Benson* v. *Fish,* 6 *Greenl.,* 141 ; *Sargent* v. *Roberts,* 1 *Peck,* 337 ; *Lott* v. *Macon,* 2 *Strobh.,* (*S. C.,*) 178 ; *Newkirk* v. *State,* 27 *Ind.,* 3 ; *Stewart* v. *B. & M. R. Co.,* 11 *Iowa,* 62 ; *Lonsdale* v. *Brown,* 4 *Wash.,* (*C. C. Rep.,*) 157 ; *Pond* v. *State,* 43 *Ga.,* 88 ; *Whitney* v. *Whitman,* 5 *Mass.,* 404 ; *State* v. *Smith,* 6 *R. I.,* 33 ; *Merrell* v. *Mary,* 10 *Allen,* (*Mass.,*) 416 ; *Farrar* v. *State,* 2 *Ohio,* (*N. S.,*) 54–8, 77 ; *Durfee* v. *Eveland,* 8 *Barb.,* (*N. Y.,*) 46 ; *Cook* v. *State,* 4 *Tex.,* app., 265 ; *Devries* v. *Phelps,* etc., 63 *N. C.,* 57. It is sufficient to show that defendants rights may have been prejudiced. *McElrath* v. *State,* 2 *Swan,* (*Tenn.,*) 378 ; *McLain* v. *State,* 10 *Yerger,* (*Tenn.,*) 24. The irregularity being shown, the court will presume the defendant was prejudiced. 26 *Ark.,* 328, and the *State* must prove that no prejudice resulted or the verdict will be set aside. *Ib.*

7. Comments on facts not in evidence is good ground of reversal. 25 *Ga.,* 24 ; *Ib.* 225 ; 15 *Ib.,* 399 ; 41 *N. H.,*

324; 77 *N. C.*, 503; 65 *Ib.*, 506; 64 *Mo.*, 595; 66 *Mo.*, 167; 10 *Ga.*, 522; 2 *Lansing*, 309; 56 *Ind.*, 182.

8. The prosecuting attorney had no right to read law to the jury not given by the court, nor read by counsel for defense and intersperse it with commments, in the *closing* argument. 1 *Leigh*, 588; 15 *Gratt*, 457; 19 *Geo.*, 398; 5 *Gratt*, 664.

9. There being more than one counsel on either side, it was error not to permit them to speak alternately. *Gantt's Dig.*, sec. 1937; 29 *Ark.*, 153.

10. Defendant was not served with a copy of the venire. *Gould's Dig.*, *ch.* 52. *sec.* 156. Nor did he waive it. All exceptions were saved by agreement of counsel. *Sec.* 4694, *Gantt's Dig.*; 19 *Ark.*, 211.

*C. B. Moore*, Attorney General, and *F. T. Vaughan*, for appellee:

1. The instructions were fair and just to the defendant, and similar ones have often been approved by this court. *Benton* v. *The State*, — *Ark.*, —; *Edmunds* v. *The State*, 34 *Ib.*, 721. The verdict does not shock a sense of justice. 34 *Ark.*, 653.

2. The motion for continuance was properly refused. 26 *Ark.*, 327.

3. Crabbe's testimony was properly admitted. *Edmunds* v. *The State*, 34 *Ark.*, 721.

4. The court did not abuse its discretion in allowing the State to examine witnesses on matters not called out by defense.

5. It was not error for the jury to take the transcript with them. *Gantt's Digest*, secs. 1877 *and* 1879. This transcript was a substitute for the indictment, and defendant's counsel did not object. Argues that cases cited by

counsel for appellant are not applicable to this case.     Not being objected to, defendant cannot now avail himself of it. *Friel* v. *State*, 21 *Ark.*, 213.

6.    There was no objection to the range and scope of the argument of the prosecuting attorney.    It was the duty of the judge to stop him, if he was making an objectionable argument.    *Berry* v. *State*, 10 *Ga.*, 552.    The cases cited by counsel were *none of them reversed* on this ground. *Ford* v. *State*, 34 *Ark.*,649, settles this matter against appellant.

7.    There was no objection to the reading law to the jury. This is a matter within the discretion of the court, and is not subject to review unless grossly abused.    32 *Ark.*, 551 ; 34 *Ib.*, 737 ; 36 *Ib.*, 292.

8.    As to the *order* of the argument, see *Acts* 1877, *p.* 30–31.

9.    Defendant was not entitled to copy of venire.     29 *Ark.*, 116, 118, 119 ; 30 *Ark.*. 328, 344–5 ; *Gantt's Dig.*, *secs.* 1895, 3673–4–7–8, 3694 ; *Acts* 1887, amending same.

ENGLISH, C. J.    Appellant was indicted for murder, in the Circuit Court of Lonoke county, at the September term, 1880 ; the indictment charging, in substance, that "said Jackson Green, on the third day of June, 1880, in the county of Lonoke, etc., did feloniously, willfully, and with malice aforethought, and with premeditation and deliberation, kill and murder one Benjamin Bowling, then and there being, by shooting him, the said Bowling, with a gun then and there loaded with gunpowder and a leaden ball," etc., etc.

The Lonoke record shows that the defendant was served with a copy of the indictment on the eighth of September, the day it was returned into court by the grand jury, and that on the same day he was arraigned and pleaded not guilty.

On the eleventh of September, upon his application, the venue was changed to Pulaski.

On the twenty-sixth of October, 1880, the trial of the prisoner was commenced in the Circuit Court of Pulaski county, and on the twenty-eighth of the same month the jury returned a verdict, finding him guilty of murder in the first degree.

Motions in arrest of judgment and for a new trial were filed by his attorneys ; and afterwards (tenth December, 1880), on a suggestion that the transcript of the record from Lonoke did not correctly show the proceedings had by the court there, in the matter of the arraignment of the prisoner, the court ordered that further proceedings on the motion for a new trial be continued until the next term, and that final judgment be suspended until then, in order that in the meantime, the record of the Lonoke Circuit might, in all things, be made to speak the truth.

At the March term, 1881, of the Lonoke Circuit Court, the prisoner being present, the prosecuting attorney filed a motion, stating that the record entry of the eighth of September, 1880, showing the arraignment of the prisoner, was incorrect, and that in fact he, on the suggestion of his attorney, waived formal arraignment, and asking that the error be corrected by a *nunc protunc* entry.

The court, upon affidavits filed *pro and con,* found the record entry in question, showing the arraignment of the prisoner to be incorrect, and that in fact he was not formally arraigned, and did not waive such arraignment, and ordered the entry to "be expunged from the record," and that the record be so amended as to show that there was no arraignment or waiver thereof.

A transcript of these proceedings was certified to Pulaski.

Afterwards, on the fifth of May, 1881, in the Pulaski

Circuit Court, the motion in arrest of judgment was sustained, and the verdict of the twenty-eighth of October, 1880, "quashed, set aside, and held for naught," and a new trial granted the prisoner.

On the first of June, 1881, he was formally arraigned upon the indictment, and pleaded not guilty; was put on trial, and the jury failing to agree, were discharged by consent of parties.

He was again put on trial the twenty-fifth of October, 1881, after motion for a continuance overruled, and on the twenty-eighth of the same month the jury returned a verdict that they found him guilty of murder in the second degree, and recommended him to the mercy of the court.

His attorneys filed a motion to discharge him, a motion in arrest of judgment, and a motion for a new trial, all of which the court overruled, and sentenced him to the penitentiary for twenty-one years. A bill of exceptions was taken, and an appeal prayed, which was allowed by one of the judges of this court.

1. CRIMINAL PRACTICE: Prisoner convicted of murder in 2d degree when guilty in 1st.

I. The motion to discharge appellant was upon the ground that he was acquitted of murder in the first degree, and that there was no evidence to convict him of murder in the second degree.

The evidence showed an atrocious murder, and if the jury believed that it was perpetrated by appellant, as, from their verdict they did, they should have found him guilty of murder in the first degree. They had the power, however, to return a verdict for murder in the second degree; and, for some reason not declared, they did it. But that was no legal cause for discharging appellant. The jury having failed to fix any punishment, the court properly sentenced appellant to imprisonment in the penitentiary. *Gantt's Dig.*, *sec.* 1981. The term of imprisonment to be fixed for murder in the second degree, between five and twenty-one

years, was within the sound discretion of the court. *Ib.*, *sec.* 1263. The jury recommended him to the mercy of the court, but the court perhaps thought that inasmuch as they, by their verdict, had, in legal effect acquitted him of murder in the first degree, and thereby secured him from the infliction of the death penalty, his claim to mercy had been fully met, and that public justice demanded that he should suffer the full measure of imprisonment prescribed by law for the degree of murder, of which the jury found him guilty.

II. The motion in arrest of judgment was upon the ground that the indictment did not state facts sufficient to constitute a public offense within the jurisdiction of the court.

No particular objection to the indictment has been indicated by counsel for appellant here, and none is perceived. It is substantially in good form, and has the merit of being short, and yet avers the material facts, and employs apt words to constitute a charge of murder in the first degree.

III. In the motion for a new trial twenty causes were assigned; the first, second and third, being that the verdict was contrary to law and the evidence, and against both.

At the time Benjamin Bowling was killed, second of June, 1880, he was a tenant, and appellant, Jackson Green, was a share-hand on Stephen Galligan's farm, in Lonoke county. A cross-fence divided their fields, and their houses, both near Indian bayou, which runs west of their fields, were not far apart. Bowling's wife was appellant's sister. East of Bowling's field, fifteen or twenty steps from his back fence, was a sand mound covered with bushes and vines. On the morning of second of June, he was harrowing new ground in his field, it having rained the night before, and his wife was walking by the side of the horses leading or guiding them. Between nine and ten o'clock,

when they were from twenty-five to fifty steps from the back fence, (the witnesses varying as to the distance) moving towards the west, Bowling was shot in the back, the ball passing through his body and coming out in front. He exclaimed to his wife that he was shot, walked a few steps, fell and died very soon. The indications in the evidence are that he was shot with a rifle from the thicket on the mound back of his field. The witnesses judged, from the hole through his body, that the ball was of the navy size.

Some of the near neighbors, who heard the report of the rifle and the screaming of his wife, gathered in, and commenced a search for traces of the murderer.

Appellant wore a pair of large brogan shoes, No. 10, larger than worn by any other person in the community, except one man, upon whom no suspicion fell. Appellant's right shoe was run down at the heel, and had nails in toe and heel. The searchers found the track of such a shoe among the bushes on the mound, a black sandy soil, and traced it from there into a thicket in the corner of appellant's field, and thence on through plowed ground to his house. The shoe prints indicated that the wearer ran from the sand mound. There was nothing noticeable in the track made by the left shoe, only it corresponded in size with the right. Appellant's rifle was found at his house, appeared to have been recently fired off, and carried a ball of the navy size.

After appellant was found and arrested, he was taken to the field, and his shoes compared with the tracks found there, in the plowed ground, and found to correspond. He was asked to put his right shoe in a track which bore indications of a rundown heel, with prints of nails in heel and toe. He manifested a reluctance to do so, and put down first the heel and then the toe of his shoe, but finally was induced to put it flat down, and it fitted the track exactly.

He admitted that the tracks were his, but said he made them when out in the morning hunting a heifer.

His sister, Amanda Green, and a brother of his, thirteen years of age, testified that he fired his rifle off early in the morning at a board, and left it at the house when he went to hunt the heifer. But he stated, when arrested, and charged with shooting Bowling, that he shot his rifle off the evening before, and had not had it in his hands since.

A witness was at his house between nine and ten o'clock, when he was not there, heard the report of a rifle back of Bowling's field, went in that direction, heard Bowling's wife screaming, she called him, and when he got to her he found Bowling had been shot and was dead.

There was some evidence that appellant had several times said that if Bowling ever whipped his wife (appellant's sister), or whipped her again, he would kill him. It was not proven, however, that he had whipped her.

Such are the leading facts tending to prove that appellant murdered Bowling. It would serve no useful purpose to state all the little circumstances in evidence tending in that way, or to detail the exculpatory circumstances put in evidence by the defense.

A case was made for the jury; it was their peculiar province to judge of the evidence. They found defendant guilty of the homicide; his honor, the circuit judge, who saw the witnesses and heard all they said on both sides, refused to set aside the verdict, and there the matter must rest.

IV. The bill of exceptions states that after the argument was closed and the court had charged the jury, his honor, the judge, handed to them the entire transcript of the proceedings from Lonoke, including the application for a change of venue, the affidavit of defendant, the corroborating affidavits of his mother, Mary Green, and Margaret Bowling, and the orders made upon the application, the ver-

3. PRACTICE: Giving papers to jury.

dict of guilty of murder in the first degree, rendered by the jury at the October term, 1880, being written on the back of the transcript in violet colored ink, and the jury carried the transcript with them to the jury room.

The handing of this transcript, so endorsed, to the jury by the judge, to take with them where they retired to consider of their verdict, though no objection was made to it at the time, was assigned as the fourth ground of the motion for a new trial.

There was nothing in the transcript that could have been prejudicial to appellant. The jury, perhaps, saw the verdict of the former jury, which was endorsed upon it. If they could have been influenced by it they would have returned a verdict for murder in the first degree instead of the second. It was, doubtless, a matter of public notoriety that appellant had been before tried, convicted of murder in the first degree and obtained a new trial, and the jury, perhaps, knew that before they saw the verdict endorsed upon the transcript, if they saw it.

It has been the custom in this State to hand the jury the indictment when about to retire to consider of their verdict, and they have usually returned their verdict endorsed upon it. The transcript from Lonoke contained a copy of the indictment on which appellant was being tried, and for that reason, no doubt, it was handed to the jury, as it had been to the former jury.

Had an objection been made, no doubt the judge would have withheld it from the jury; and, though none be made, the better practice is not to give a jury an indictment or a transcript on change of venue, on which a former verdict appears.

V. The fifth ground of the motion for a new trial was that the court erred in refusing the first, second, third, and fourth instructions asked for by appellant.

The first was : ''The court instructs the jury that where verbal admissions or declarations of a defendant are given in evidence, he is entitled to have all the declarations made by him at the same time taken together, as well what he said in his favor as against him.''

But the court decided the law to be, and so instructed the jury, ''that where verbal admissions or declarations of a defendant are given in evidence, he is entitled to have all the declarations made by him at the same time, considered together by the jury, as well what he said in his favor as against him ; it is for the jury to say how far they believe the one or the other.''

The instruction as given by the court was a proper modification of that moved for appellant. *Howard* v. *State*, 34 *Ark.*, 433.

The second was : ''That in case of circumstantial evidence, before the jury are justifiable in finding the defendant guilty, they should be satisfied beyond a reasonable doubt, that the State has proved a motive for the murder.''

2. MUR-DER: Motive: Proof of not essential to conviction etc.

It is certainly competent for the State to prove that one accused of murder was influenced by some motive to commit the crime, ( *Wharton Criminal Evidence, sec.* 784, *etc., and notes*), and where the guilt of the accused is to be established by circumstances, and not by eye witnesses, proof of some particular motive may strengthen the case. But the purpose or motive of the criminal may be so artfully concealed as to put it out of the power of the prosecutor to discover or prove it. *Burrill on Cir. Ev.*, 126, *etc.*

It is not therefore true, as a legal proposition, that the State must prove a motive for the murder, in a case of circumstantial evidence, as assumed in the above instruction moved for appellant, and refused by the court.

It is sufficient for the State to prove the *corpus delicti*, and to establish by circumstances the guilty agency of the

accused.   If it appear from the evidence that there was no motive on the part of the accused to commit the crime, this may be urged before the jury as an argument in favor of his innocence.

"Motives," (says Mr. BURRILL, p. 296,) are made use of, like other evidentiary circumstances, not for their own sake, or from any views of speculative curiosity, but simply as means of arriving at the knowledge of an ultimate fact. They are resorted to as elements of evidence, not from any supposed necessity of accounting for, or explaining the reason of a criminal act which has been clearly proved and fixed upon the accused, however strange or inexplicable such act may in itself appear, but from the important aid they always render in completing the proof of the commission of such act by the party charged, in cases where it might otherwise be thought to remain in doubt.   With motives, in any speculative or psychological sense, neither the law, nor the tribunal which administers the law, has any proper concern.   The outward *acts* of men are all that they profess, or are called upon to regulate and punish.   *   *   *   * Where a man, in his senses, deliberately plunges a knife into the breast of another, or strikes with a weapon, which he knows must kill, the law does not stop to inquire into the intent, but justly infers it from the act itself, which shows, upon its face, a will or design to take life.   Much less does it attempt to go further back in the inquiry, by seeking for the *motive* which may have originally prompted the act," etc.

4.  INSTR-
UCTIONS:
Reas'o n-
able doubt

The third instruction moved for appellant was: "That in cases of circumstantial evidence, before the jury can convict, the guilt of the defendant should be made out, not only beyond a reasonable doubt, but to the exclusion of every other reasonable hypothesis."

The court refused to give the instruction as so framed, but declared the law to be: "That in cases of circumstantial evidence, before the jury can convict, the guilt of the defendant should be made out to the exclusion of every other reasonable hypothesis."

It was putting it very strong to require the State not only to prove the guilt of the accused beyond a reasonable doubt, but to go further, and prove it to the exclusion of every other reasonable hypothesis. Either would be sufficient.

The court expressed the rule sufficiently strong, and as to the law of doubts, fully instructed the jury in its general charge.

The fourth instruction moved for appellant, was: "That statements made to or about defendant, not in his immediate presence or hearing, and when and where he did not have an opportunity to reply, or when he was under duress or imprisonment, are not evidence and are not to be taken to his prejudice."

The court refused the instruction as so formulated, but declared the law to be: "Voluntary conversations with others, by the defendant in regard to the crime charged, and statements made by others in his immediate presence and hearing in relation thereto, are competent evidence to go to the jury. It is for them to determine, under all the circumstances, what effect, if any, such evidence produces towards establishing the main issue of guilt or innocence. Of course defendant should not be prejudiced by any such statements made by others and not heard by him."

The instruction, as so framed, was applicable to some features of the evidence, and substantially in accordance with the ruling in *Ford* v. *State*, 34 *Ark.*, 650.

VI. The sixth ground of the motion for a new trial was that the court erred in its entire charge to the jury. The

general charge of the court to the jury was full, clear and fair, alike to the prisoner and the State, and not even a general objection was made to it below, when given ; at least the bill of exceptions shows none, and counsel for appellant, in their brief, have pointed to no feature or clause of the charge as objectionable.

VII. Counsel for appellant have manifested good taste in not urging here the seventh ground of the motion for a new trial—"That the indictment charges that Ben Bowling was murdered on the third day of June, 1880, and all the evidence shows it was on the second day of June, 1880."

*Order of argument to jury.* VIII. The eighth assignment is that—"The court erred in not allowing and compelling counsel to speak alternately, there being more than one counsel for both the State and defense."

The bill of exceptions shows that Mr. Benton opened the argument on the part of the State, that Mr. Blackwood and Mr. McLaughlin followed for the defense, and Mr. Vaughan, the prosecuting attorney, closed the argument. It is not shown that the court made any ruling, or was asked to make any, as to the order in which the attorneys should speak.

The plea was, not guilty ; the burden of proof was upon the State, and her counsel had the right to open and conclude the argument. *Acts* 1877, *p*. 30.

There being but four attorneys engaged in the case, two on each side, if the court had been asked to require them to alternate, and so ruled, there would necessarily have been three speeches on the side of the State, in order to allow her right to open and close the argument, and two on the part of the defense. The order of debate having been arranged as it was, apparently by the counsel themselves, but four speeches were made, which was an economy of time.

Green v. The State.

IX. The bill of exceptions fails to show that the court 5. BILL OF EXCEP-TIONS: Its province. made any rulings whatever, or was asked to make any, on the matters complained of in the ninth, tenth, eleventh and twelfth assignments in the motion for a new trial. They complain that Mr. Benton, who began the argument for the State, did not fully open the case, and that the prosecuting attorney, in his closing argument, commented on matters not in evidence, and animadverted severely on the conduct of Mary Green, mother of appellant, who had removed her seat near to the jury, and indulged in weeping, and on the fact that she had not been examined as a witness for the defense; and that in reading a note from GREENLEAF on Evidence, he had interspersed comments, etc. These matters, as stated in the motion for a new trial, are repeated in the bill of exceptions, but it is not shown that the defense desired Mr. Benton to make a longer argument, or more fully to open the case on the part of the State, or that the court was asked and refused to require him to do so. Nor that any objection was made at the time to the manner or range of argument indulged in by the prosecuting attorney, or that the court was asked to rule him to order, and declined to interfere; nor do we know, except from conjecture, the latitude of argument indulged in by the counsel for the defense who preceded Mr. Vaughan.

It is the province of a bill of exceptions not only to bring facts upon the record that would not otherwise appear, but rulings of the court on questions of law, and exceptions to them, in order to have them reviewed here. The order of argument, when a number of counsel are engaged, the subjects, length and range of their discourses to the jury, must necessarily be left to the sound discretion of the presiding judge; and unless the bill of exceptions shows, as it does not in this case, that such discretion was abused in making, or refusing to make rulings in relation

to the argument, it is not the subject of review here. *Ford v. State, 34 Ark.*, 658; *Dobbins et al v. Oswalt, Ex'r.*, 20 *Ib.*, 619.

X. The thirteenth ground of the motion for a new trial was, that the court overruled appellant's motion for a continuance.

In the motion it was stated that a number of witnesses were absent, for whom appellant had caused subpœnas to be issued, etc. That on the two former trials attempts were made to impeach Margaret Bowling and Mary Green, two of his material witnesses; and he expected to prove by some of the absent witnesses named, that their reputations for veracity and morality were good. And that he expected to prove by others of the absent witnesses named, that about the year 1877, in Jefferson county, deceased, Ben Bowling, ran away with the wife of one House, and that said House was very much angered, and made threats that he would follow Bowling until he killed him.

The bill of exceptions shows that Margaret Bowling, widow of the deceased, was introduced and examined by the State at the last trial, and, of course, there was no attempt on the part of the State to impeach her; and appellant did not cross-examine her. The bill of exceptions also shows that Mary Green, mother of appellant, was present at the trial, but not examined by him. She appears to have taken no part in the trial except to place herself near the jury and weep when Mr. Vaughan commenced his argument, which he seems to have regarded as a scene devised by the ingenuity of the counsel for the defense, and let loose the thunder of his eloquence against it in not very guarded or prudent language.

The story of Bowling's theft of House's wife, and his ire and threats, would not have been relevant evidence if the absent witnesses had been present to prove them. Passing

over the question of diligence, appellant does not appear to
have been prejudiced by the refusal of the continuance,
which was a matter within the sound discretion of the court.

XI. The fourteenth assignment was, "that appellant
was not furnished with a list of the jurors before going
into trial.

This court has repeatedly decided that the present crimi-
nal code makes no provision for furnishing such list before
trial, as was done under the former practice.   *Benton* v.
*The State*, 30 *Ark.*, 344; *Wright* v. *State*, 35 *Ib.*, 648.

XII. The fifteenth assignment was, "that the court
erred in permitting the testimony of John Gainer to go to
the jury.

John Gainer testified, among other things not objected
to, that about a month before the killing he heard defend-
ant say that if Bowling ever whipped his (defendant's) sis-
ter again he would kill him.

This was competent for what it was worth, as tending to
prove malice.

XIII. The sixteenth assignment was that the court erred
in allowing the State to prove what J. S. Cavin had sworn
to on a previous trial of the case.   It was proved that J. S.
Cavin had been sworn and examined as a witness at the pre-
vious term of the court on the trial of this case, and had
since died.   After laying the foundation the State proved
that he testified on that trial that he had heard defendant
say that if Ben Bowling mistreated his sister again he would
kill him—that if he did not quit he would leave him where
he found him.

The testimony of a deceased witness, examined on a
former trial of a caiminal charge, may be proved on a sec-
ond trial for the same offense.   *Pope* v. *State*, 22 *Ark.*,
372.

XIV. Witness N. B. Crabbe, was one of the persons who
   40–38

7. Same:
Furnish-
ing list of
jurors to
prisoner
not re-
quired.

8. Same:
Evidence
of a de-
ceased
witness
may be
proved.

found the tracks on the sand mound, traced them to appellant's house, and afterwards, on the same day, found and arrested him. On attempting to arrest him he ran across a bayou and made tracks in the mud. They halted him by firing their guns, captured and brought him back over the bayou. Kit Haskins, one of the party, remarked, when they were crossing the bayou with defendant under arrest, "that the shoe that made that track was on the man that killed Bowling," to which defendant made no reply. It was objected on the part of the defense that the remark of Haskins about the shoe track was not competent evidence, as defendant might not have heard it. But the court, after hearing the statement of witness Crabbe, as to the tone of voice in which Haskins made the remark, and the distance defendant was from him at the time, remarked that it could go in, and said to the jury that they could say whether the defendant heard it or not. This was made the seventeenth ground of the motion for a new trial.

The silence of the prisoner, when the remark was made about the shoe track, if he heard it, which was left to the jury, was worth but little as a tacit admission, but it has been ruled that such evidence is admissible for what it is worth. *Ford* v. *State*, 34 *Ark.*, 649.

XV. The eighteenth assignment was that the court erred in permitting the State's attorney to cross-examine Amanda and Toney Green on matters not brought out on the examination in chief.

The bill of exceptions shows that Amanda Green was introduced as a witness for, and examined by defendant, cross-examined by the State, and re-examined by defendant.

It also shows that Toney Green was introduced and examined by defendant, cross-examined by the State, re-examined by defendant, and re-cross-examined by the State. And at the close of his examination by both parties, the bill of

exceptions states that, "Defendant excepted to all examination on new matter in the cross-examination of Amanda and Toney Green, not responsive to examination in chief;" but it is not shown that any part of their testimony was admitted which was objected to by defendant, or that the court made any ruling about it.

XVI. The nineteenth assignment was, that "The court erred in not allowing defendant to prove by Hardy Jones and others, that they knew from general reputation and hearsay, that Ben Bowling had seduced one Sallie Strange, in the neighborhood where the killing of Bowling took place."

Counsel for appellant have not submitted here that the court erred in excluding such evidence. It is no defense to show that the person slain was an immoral or bad man. *Whart. Cr. Ev.*, sec. 68.

XVII. The twentieth and last assignment was, "That the jury were permitted to come from the jury room at night, and spend the night and part of the next day in the court room, while deliberating upon their verdict, where there were law books and loose papers pertaining and relating to the case."

There is not a word in the bill of exceptions to show the truth of this assignment.

Thus we have noticed every assignment in the motion for a new trial, and found no substantial error in them to the prejudice of appellant. At last, under our practice, they resolve themselves into one main question : did the court err in overruling the motion for a new trial? We think not, and upon the whole record, the judgment must be affirmed.