# THE STATE v. ROBERT W. DAVIS, Appellant.

## Division Two, March 15, 1910.

1. **INSTRUCTION: Confession: Things Said Against and For Self.** It is not error to refuse to instruct the jury that "all verbal admissions and written confessions made by defendant, admitting the crime charged against him, must be taken together as a whole, as well that part which makes for the accused as that part which makes against him; and if the part which is in favor of defendant is not disproved and is not apparently improbable or untrue when considered with all the other evidence in the case, then such part favoring the defendant is entitled to as much consideration from the jury as any other part." Such instruction does not declare the law. The law is that what the proof may show, if anything, the defendant has said against himself, is presumed to be true, because against himself; but anything the jury may believe from the evidence he said in his own behalf they are not obliged to believe, but may treat the same as true or false, just as they believe it true or false, when considered with a view to all the other facts and circumstances in the case.

2. **MURDER IN FIRST DEGREE: Deliberation: Facts of Case.** Deceased and defendant, the one seventeen and the other twenty-two years of age, and about the same size, had been friends and no unfriendliness had ever existed between them. At defendant's request, apparently altogether friendly, they started down into the city about seven o'clock on the evening of November 14th. According to defendant's confession and testimony they got into a quarrel over the place to which they would go, and deceased with his fist struck defendant, who in return slapped him in the face, knocking him down, and thereupon deceased got up and took out his knife and started towards defendant, who "clinched with him," succeeded in getting the knife from him, and with it cut him in the side, and then inflicted a fatal blow in the neck, and threw the knife away. Then he placed the body in some weeds, and started away, but returned, went to a near-by bridge, got a rock and crushed his skull, inflicting another mortal wound. Then he took his money, amounting to five dollars, and his watch, and with the money redeemed a coat which he had pawned, and later in the night pawned the watch in deceased's name. Later in the night he returned to the place of the homicide, and

carried the body some distance and threw it in a manhole. He testified he did not intend to kill deceased, and cut him in self-defense. In one of his confessions he stated deceased drew his knife before he knocked him down; in the other, that he drew the knife when he got up after he had knocked him down. *Held*, that neither the jury nor the court are required to accept this statement in its entirety; and there being testimony that the only knife deceased owned was found in his inside trousers pocket after his body was removed from the manhole, and that at that time on his hands, laced up, were leather gloves which he wore when he started down town, the jury were authorized to find defendant deliberately inflicted a mortal wound, and in finding him guilty of murder in the first degree, and the court was justified in submitting an instruction for that degree of murder.

3. ———: ———: **Definition.** Deliberation does not mean brooded over or reflected upon for a week or a day or an hour; but it means a conscious purpose to kill, formed in a cool state of blood and not under violent passion suddenly aroused by some real or supposed grievance. Where defendant, after deceased had been rendered helpless by the stabs with a knife he had given him, and was prostrate on the ground, bleeding with a fatal cut in the neck, and his body had been removed from the highway, walked away, but returned, looked for and found a rock, and with it crushed the skull of deceased, he deliberately inflicted this last fatal blow.

4. ———: **Motive: Absence.** The absence of an apparent motive is not conclusive of defendant's innocence. Motives for crime are so numerous, so hidden, and often so utterly unreasonable that it is impracticable to require the State to make them manifest. There can be murder without motive, nor does it follow that there was no motive because the State was unable to show one, or that the only one shown seems inadequate. The criminal act and the connection of defendant with it having been established beyond any reasonable doubt, the act itself will allow the inference of motive, whether it is made to appear or not.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

AFFIRMED.

*R. W. Goldsby* and *James Peck* for appellant.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1)  Instruction 1, requested by appellant was correctly refused.  It does not correctly declare the law as to the legal effect of written confessions.  Instruction 6, given by the court, is an exact copy of an approved instruction as set out in State v. Tobie, 141 Mo. 561.  It is free from any just criticism, and this court has long since "declined to enter upon its defense."  State v. Darrah, 152 Mo. 541; State v. Wilson, 223 Mo. 173; State v. Carlisle, 57 Mo. 102; State v. Brown, 104 Mo. 365; State v. Wisdom, 119 Mo. 552; State v. Young, 119 Mo. 525; State v. Peck, 85 Mo. 192; State v. Curtis, 70 Mo. 594; State v. Talbot, 73 Mo. 347; State v. Walker, 98 Mo. 108; State v. Cushenberry, 157 Mo. 188; State v. Howell, 117 Mo. 307; State v. McKenzie, 144 Mo. 44.  (2)  The only question for consideration is whether the evidence warranted the court in instructing on murder in the first degree.  From the proof in this cause, the jury must have found that appellant, after the controversy with deceased as contended by him, and after the cutting of deceased, with deliberation, went to the creek and obtained the rock offered in evidence and came back and crushed the head of deceased, thereby carrying out a deliberate purpose to kill.  All of these facts were before the jury, and the jury were left, under the instructions of the court, either to find appellant guilty of murder in the first degree or in the second degree, or guilty of manslaughter in either the third or fourth degrees.  We think the facts, in view of the different confessions made by appellant, and in view of the physical facts that deceased had on his gloves, and his knife was found in his pocket, and the further fact that appellant robbed deceased of the five dollars in money and his watch, after the murder, were sufficient to warrant the jury in finding that the murder was done with deliberation.  The further facts that

appellant hid the body of deceased, and also destroyed all bloody clothing worn by appellant at the time of the tragedy, are facts strongly indicating that the jury was warranted in finding appellant guilty of murder in the first degree. It is very probable that the mere cutting of deceased would not have killed him, at least for some time, and perhaps not then, as the testimony given by appellant shows that deceased was trying to get up on his feet at the time appellant struck him on the head with the rock and crushed his skull.

GANTT, P. J.—On December 8, 1908, an information duly verified was filed in the criminal court of Jackson county, charging the defendant with murder in the first degree of Harry H. Evans on November 14, 1908. The information was in due and approved form and it is therefore unnecessary to set it forth at length.

Afterwards on the 12th of December, 1908, the defendant, being in custody, was duly arraigned and entered his plea of not guilty, the court at the same time having assigned him counsel. The cause was then continued from time to time until the 28th of December, 1908, when it came on for trial before a jury and resulted in a verdict of guilty of murder in the first degree and assessing the punishment at death. A motion for new trial was duly filed, heard and overruled, and the defendant sentenced in accordance with the verdict. From that judgment he has appealed to this court. The defendant is not represented in this court by counsel. The facts disclosed by the record are substantially these:

Harry H. Evans, the deceased, was a boy just past seventeen years of age, at the date of his death, and lived with his father at number 2923 Mersington street, Kansas City. The father of the deceased was engaged in the stone-quarry business in Kansas City, and Harry drove a team for his father and made collections for him. On Saturday evening, November 14, 1908, at

about seven o'clock, the deceased, and a brother by the name of John, left their home and went to a number of stores in the neighborhood.  At one of the stores John paid a small bill that he owed for tobacco.  When the deceased left home that evening he was wearing a pair of overalls over his dress trousers, and a heavy coat of corduroy or ducking, and a pair of heavy shoes. He and his brother met the defendant, Davis, at Twenty-seventh and Cleveland streets at 9:30 o'clock that evening.  The boys informed the defendant that they were going down town to have their shoes mended, whereupon the defendant, who had a bucket of beer, invited them to go with him to his home and he would go with them after leaving the beer. Deceased accepted the invitation, but John, his brother, declined it.  This was the last time the deceased was seen alive by any member of his family.  The evidence tends to show that the defendant and the Evans family were on friendly terms and that he often visited the Evans brothers.  Defendant is a young man, about twenty-three years of age at the time of the trial.  The body of the deceased was found in a manhole, on the following Sunday morning about nine o'clock, at Twenty-ninth and Monroe streets, with his skull crushed and one of the main arteries of his neck severed by a knife. He had on his gloves which were strapped around his wrists.  His pocket knife was found in the pocket of his under trousers.  Several pools of blood were found, some three blocks away, some two and some one from where the body was found.  Appellant was arrested on the day the body of the deceased was found, and thereafter made three written statements.  The first statement was as follows:

FIRST STATEMENT.

"Metropolitan Police Department.

"Kansas City, Missouri, November 18, 1908.

"My name is Robert Davis.  I live at 1919 Myrtle.

226 Sup—32

I live with my mother, father and brother and sisters. I am twenty-two years old. The last work I done was for Mr. John Crow in his rock quarry at Twenty-eighth and Cleveland. Saturday night, November 14, him (Harry Evans) and his brother John was up on Twenty-seventh and Cleveland, and I came along and met them. John, he first said to me, he said; Your going to town? Yes, when I take this beer home, I said, well then, I said, run down with me it won't take long, then John he complained of being tired and says I'll wait here you go down with him, Harry. Harry he went on with me back to my house and waited there a few minutes till I changed clothes then we started talking about going down on Third and Broadway, we was going to meet John. Harry he did not want to go down on the Row but wanted to go to a chitilin supper upon Twenty-eighth and Jackson at Mrs. Colley's and I wanted to go down there, he objected to going down there, and one word brought on another and so he jerked out his knife and I slapped him in the face I didn't hit him with my fist for if I had I would have knocked him unconscious for I got strength you know. When I hit him I knocked him down he got up with the knife and tried to open it as he got up and I jumped back to let him open it and then I run in to him and clinched him and took the knife away from him then I cut at him from right to left then I jabbed back at him from left to right and cut him about the neck somewhere, I don't know exactly where. I don't remember of cutting him more than once, but I might have cut him the first time I swung at him. When I jabbed at him the second time and cut him he screamed and the people next door came out on the porch that is the white people in that little white house with green trimming on it, come out on their porch. When he screamed he fell down and I pulled him over there in the weeds and then I walked down the road north a little ways and come back and

got a rock and knocked him in the head. When I walked away after cutting him I throwed the knife in the creek, right after I hit him in the head with the rock I throwed the rock over towards that box elder tree on the side of the branch. I then went north on Myrtle to Twenty-ninth and went angling across to Twenty-eighth and Cleveland and then north on Cleveland to Twenty-seventh, then I walked west on Twenty-seventh to Indiana avenue and took the Indiana avenue car north and came down to Eighteenth and Paseo I got off then and went to the Chicago Loan Office and got my overcoat which I had pawned there for two dollars. I paid him two dollars and fifty cents then I walked west on Eighteenth to Troost and got a Vine street or Minnesota car and rode to Fifth and Main and went to Costello's saloon then I went to Third and Broadway then I went up and got on Indiana avenue car at Fifth and Deleware and rode to Twenty-seventh and Indiana and transferred to Twenty-seventh car and rode to Jackson avenue the end of the line and then I went to Mrs. Colley's, I stayed there until about 1:25 then I went home I went south on Jackson to Twenty-ninth west on Twenty-ninth to Myrtle and on down Myrtle home. I went home and pulled off my overcoat and came down and went to where Harry was and tried to hide him to keep any one from seeing him, that is, I carried him west across the pasture to the manhole at Twenty-ninth and Monroe and threw him in there. I only stopped once on the way and that was in the pasture about Mersington. After I dumped him in the manhole I went home and took off all of my clothes except my underclothes and laid down beside John and slept some. When I got home after dumping the body in the sewer I laid down and then got up and went to the toilet and then came back and laid down and went to sleep then when I woke up I looked out the window I thought it had snowed, then I laid down and

pretty soon I looked out again I thought I heard some one whistle, then I laid down again John asked me both times I looked out the window what I was looking for and I told him what I told you. I didn't sleep any more after that and pretty soon I got up and went down stairs and got some water and brought it up stairs and put it on the stove and then I started a fire in the stove. I put in some paper first then put in the drawers I wore Saturday night when I killed Harry Evans, then I put in a pair of ragged pants I had worn recently and then I put in four or five pieces of wood and the sox I wore when I killed Harry, then I dressed and came down stairs also when I built the fire I put in and burned an old undershirt that I used to wash the blood off my pants with and I put an old shirt in the fire. I didn't wear none of them the night I killed Harry. I have got on the coat and pants I wore when I killed Harry and I have got on the same undershirt but the drawers and sox I burned, when I built the fire I heated some water and washed and dressed and came down stairs. I washed the blood off of my pants before I came down stairs. I did not get any blood on my coat, vest or shirt. When I went down stairs I did not remember much what I done for I didn't stay there very long. When I come down stairs Bob (Williams) was drawing a bucket of water. I went into the kitchen and he went on into my father's room. My sister Anna said something about that blood out there. I don't remember exactly what I said to her but I went out the side of the house and down Myrtle avenue to where there was some blood. I met the doctor there who was attending my father, he says 'there's a lot of blood here, I wonder how it got there,' I said, 'I don't know, I guess somebody got into a fight,' then I walked on. I walked north on Myrtle to Twenty-ninth and then walked west on Twenty-ninth to Cleveland, then I went south on Cleveland to

Twenty-ninth, you know Twenty-ninth jogs there.    I went over to Indiana on Twenty-ninth caught the car and got off at Eighteenth and Grand, walked to Nineteenth and Grand, got my shoes shined there, then I walked back up to Eighteenth, got on a car, then got off at Ninth and Minnesota, then I walked around and walked over to Tenth and Walker, and then walked over to 836 New Jersey, that's where my cousin lives, it is my mother's cousin, so I guess it my cousin too. I got to my cousin's about 12 o'clock and stayed about fifteen minutes, then I walked to Ninth and Minnesota and then walked back to Fourth where the car started across the viaduct, then I taken an Indiana avenue car there and rode to Fifth and Delaware and got off and went to Costello's and then went back to Fifth and Delaware and got a Vine street car and rode to Nineteenth and Vine and went into a drug store then went to 2312 Vine and then to 2444 Woodland, then I went down got on Vine street car and rode to Tremont and Haskell avenue K. C. K. and then from there I went back on Jackson avenue car and got off at Fifth and Minnesota and got on Indiana avenue car, went out to Nineteenth and Vine again and then I went to 1819 Vine, some people named Anderson then I went to church on Woodland between Eighteenth and Nineteenth, then I got on a car went out to Twenty-seventh and Cleveland and was arrested.    When me and Harry Evans was talking about going down on the Row we was just leaving home and had just got down by that ash or pig nut tree when the fight started and it was right there where I cut him.    The Harry I speak of in this statement is Harry Evans.    This statement is the truth.    I make it freely and voluntarily to John W. Hogan, Asst. Pros. Atty. because I am a Christian and want to tell the truth.    No threats or promises of no sort were made to get me to make this statement.

ROBERT W. DAVIS.

"Walter Whitsett, Captain of Police.
"John Casey, Captain of Police.
"John W. Hogan, A. P. A.
"George H. Mosley."

The second statement was in these words:

SECOND STATEMENT.

"Metropolitan Police Department.

"Kansas City, Mo., November 19, 1908.

"My name is Robert W. Davis. I went out with you all this morning to the place where I killed Harry Evans last Saturday night and I went with you around from where I killed him to where I dumped him in the sewer. In my statement yesterday Mr. Hogan didn't get it just exactly right for when I cut Harry Evans there by that pig nut tree where that first pool of blood was that place where that first picture was taken, he screamed and fell down and I drug him back a little ways off the path and then I went down to the bridge and got a rock, that wide flat rock what you found on the north side of the branch, it seems to me to be the rock I used, of course I can't identify it positively, because it was dark and I could not see the rock, but it felt like the one you showed me, it was that kind of a rock; when I picked up that rock I went back to where Harry was lying and knocked him in the head with it and then left him and went down to the corner and when I got there I turned round and came back to where Harry was lying and drug him back to where that big pool of blood is. When I drug him back and left him I noticed some string hanging out of his pocket and so I pulled them out and found they was on a sack made of leather what you buy in the store and what you close by pulling on these strings, like a tobacco sack. I pulled this sack or money bag or what ever you call it out of his pocket and held it in my hand and then I started to go away and while I was walking over to the path I seen his watch lying on the ground where it fell

out of his pocket I didn't know where to hide it and so thought the safest thing for me to do was to hide it where it would do me the most good, and so I did by taking it to a pawn shop on the southwest corner of Sixth and Main streets. I pawned it there in Harry's name and got one dollar on it. I pawned it there Saturday night after I got my overcoat out of pawn and come on down town. After I left Harry's body after getting this money back and his watch I walked up Myrtle to Twenty-ninth and then went angling across Twenty-eight and Cleveland on the way over there I opened this money sack to see what was in it and found it had just the five dollar bill. I threw the money sack away and held the five dollar bill in my hand until I got to Twenty-seventh and Cleveland, there I found Russell Cantrell in Dad Allen's lunch room and I knocked on the window and called Russell outside and handed him the bill to pay him fifteen cents I owed him. He got the money changed in Church's grocery store and then I came on down town just as I told you in my statement yesterday except that I got off the car at Ninth and Main instead of Fifth and Main. I walked down from Fifth to Ninth on Main street and stopped at Sixth street in the pawnshop to pawn this watch and I pawned it in Harry's name because I thought that was the safest thing to do. I knew Harry was dead and could not come back for his watch and that would throw suspicion away from me. This watch with the word 'Obelisk' on the dial and hole chipped out of the enamel there where the seven is, and has a good luck horse shoe with something said in it and the words 'compliments Ash Grove Lime and Portland Cement Company, Kansas City U. S. A.' On the back of it for a charm on the end of the leather fob is Harry's watch and fob and is the one I pawned in his name Saturday night and is the one I found near his body after I drug him over in the weeds, but it ain't a gold watch like they say it is.

It is only an old cheap brass watch, it is the watch that Mr. Hogan showed me. This statement is the truth. I made it freely and voluntarily to John W. Hogan, Asst. Pros. Atty. No threats or promises were made to get this statement from me.

"ROBERT W. DAVIS.

"Walter Whitsett, Captain of Police.
"Arthur Frederick Killick.
"John W. Hogan."

The third statement is said to have been made in explanation of the gloves found on the hands of the deceased, but it is not set out in the transcript. The money, bank or pocketbook carried by the deceased at the time of his death, was found some three blocks from where his body was found and near one of the pools of blood. The written statement shows that he took from the body of the deceased the pocketbook and five dollars in money and with the money he redeemed from pawn his overcoat. He also took from the body of the deceased, a watch, and on that same night pawned a watch in the name of the deceased. The defendant testified in his own behalf as follows:

"Q. Now, commencing, Robert, with the time you and Harry came to the house, we won't go back to your meeting the two brothers down there and asking them to go down there, and John wouldn't go, and you went down to your house and came out of your house with Harry; commence with the coming out of the house that night. You had some talk about a chitling supper and going down to Third and Broadway. State what took place from the time you left the house to the time of the killing? A. On leaving the house we went north on Myrtle from the house and near the bridge there is—there stands an ash tree.

"Q. What were you talking about as you left your father's house? A. We were talking about the different places to go and so on.

"Q.   Were you proposing to go some place?   A. I was going down on Third and Broadway.

"Q.   Where did he want to go?   A.   He wanted to go down there, too; he wanted to go over there first and monkey around.

"Q.   Where?   A.   Mrs. Colley's residence, Twenty-seventh and something, Jackson.

"Q.   Was it a chitling supper?   A.   Yes, sir.

"Q.   Go ahead and tell what you said and what he said?   A.   Then he didn't want to go down there. He had been down there once before and getting into some trouble.   One word brought on another, and then we had an argument and all like that, and finally he struck at me and I struck him.

"Q.   What did he strike you with?   A.   With his fist; then I slapped him, then he went down.   He went to his hands and almost to the ground.

"Q.   When you slapped him he partly fell and staggered?   A.   Yes, sir; then when he got up he opened his knife and then —

"Q.   Talk to the jury.   You have seen this knife. What was the size of the knife compared with his knife here?   A.   About that much larger than this.

"Q.   How much larger?   A.   About twice as large or more.

"Q.   Do you know whether it had more than one blade or not?   A.   I think it was just one-bladed knife.

"Q.   You think it was twice as large as that?   A. Yes, sir.

"Q.   After you slapped him and he stumbled or partly fell, then did he come towards you with a knife? A.   Yes, sir.

"Q.   Then what did you do?   A.   I clinched and took it away from him.

"Q.   In what way did you clinch him, were you to the side of him?   A.   Right in front of him and

me to the south of him; then I ran to him and wrenched it out of his hand.

"Q.   At the time that he opened the knife how far apart were you?   A.   About eight feet apart.   Just so that I could see it; it was dark.

"Q.   At the time that you slapped him did you step back a little?   A.   Yes, sir.

"Q.   Then he   opened his knife as he came up? A.   Yes, sir.

"Q.   He came towards you?   A.   Yes, sir.

"Q.   Then you jumped at him and clinched him? A.   Yes, sir.

"Q.   Can you tell how you clinched him?   In what way you clinched him?   A.   I clinched him with my right arm around his left arm, then I caught his right hand with my left hand, then I twisted the knife out of his hand, then I taken the knife away from him.

"Q.   Did you know under the excitement of the moment whether he had on gloves or not?   A.   I can't say whether he had on gloves or not.

"Q.   You don't know?   A.   No, sir.

"Q.   Then you wrenched the knife out of his hands?   A.   Yes, sir.

"Q.   Then what did you do when you got the knife?   A.   When I got the knife he was going back from me something like he was going to get something else.

"Q.   While you were struggling to get the knife from him, state to the jury whether he was still trying to fight with you?   A.   Yes, sir.

"Q.   When you got the knife what did you do? A.   Then he was making back to his pocket again, then came back at me all the time, then I cut at him from right to left, then at the time he fell.   He was standing north from me then.   As I cut at him he turned like this, then he fell.   He fell with his face to the bridge, which was north, then right there from the bridge I got a rock and hit him on the head with it.

"Q. He was as far from the bridge as from here to the table there? A. Yes, sir.

"Q. How much do you weigh? A. I weighed when I came here about one hundred and sixty pounds or something like that.

"Q. How much would Harry have weighed, if you know? A. He would weigh as much as I did, and he was as tall as I am.

"Q. Had you ever had any fight with him? A. No, sir.

"Q. Were you friends? A. Yes, sir.

"Q. Did you want to kill him? A. No, sir.

"Q. Did you try to kill him? A. No, sir, that is, I didn't intend to kill him.

"Q. Did you think about killing him at the time at all? A. No, sir.

"Q. What were you trying to do? A. Trying to defend myself.

"Q. Could you in the darkness—was the moon shining? A. No, sir.

"Q. Could you in the condition of darkness that was there at the time, could you see the cutting, did you know the effect when you were striking right and left that way; could you see the effect of striking that way? A. Could I feel it?

"Q. Could you tell where you struck him? A. No, sir, only the time the first time that I struck at him from right to left; I didn't when I struck from left to right and stuck him.

"Q. Did you know to what extent that you hurt him? A. No, sir.

"Q. When he fell did he stagger to rise again? A. Yes, sir.

"Q. Was it then that you got the rock to hit him? A. Yes, sir. I got the rock and struck him.

"Q. Robert, look at the jury and you tell them truthfully whether or not you did intend to kill that boy at the time that you cut him? A. No, sir, I didn't

intend to kill him; I never thought of such a thing; I wouldn't have done the same thing over for my right arm.

"Q. Did you like the boy. A. Yes, sir. We were always good friends; I never had a fight with him or a quarrel before.

"Q. Did you know any thing about him having any money, one dime or ten dollars in his pocket when you cut him. A. No, sir.

"Q. You had no thought of that? A. No, sir, I never thought of that.

"Q. You have heard this confession of yours read? A. Yes, sir.

"Q. When you went back you hid the body? A. Yes, sir.

"Q. You thought that you had done wrong? A. Yes, sir.

"Q. Was that written statement or confession telling the truth about that? A. I don't think it is just exactly the truth; it is the truth in a way. Right there inside of the string hanging out, if I did say it, what I meant my hand caught on the string when I was handling the body. After he fell there I grabbed the body about middleways, then this string was hanging out I suppose from him pulling his knife out and it caught, and it jerked out, my thumb caught the string.

"Q. I believe it is best for to tell the truth. Had you thought of money up to the time that your thumb caught on that string? A. No, sir; I never thought of money before.

"Q. On pulling it out and the money being there, you thought it best to take it? A. Yes, sir.

"Q. Did you find watch as you stated it in your statement? A. Yes, sir.

"Q. You didn't see the watch when it fell out, at the time that it fell out? A. Yes, sir.

"Q. When you went back to get the body you found the body there? A. After I had taken the body over there a little ways.

"Q. Were you looking for the watch? A. No, sir.

"Q. You just happened to see it? A. Yes, sir.

"Q. You were to take some beer to the house? A. Yes, sir.

"Q. In a jug? A. Yes, sir.

"Q. Did you ask both of the boys, Harry and John, to go down to the house with you? A. Yes, sir.

"Q. Then you were going out with them? A. Yes, sir.

"Q. You had no thought then of cutting this boy or getting him out alone to do him harm? A. No, sir.

"Q. John said he was tired, and Harry said he would go. A. Yes, sir.

"Q. At the time that you say you got into a quarrel or dispute one word brought on another? A. Yes, sir.

"Q. He struck at you and hit you? A. Yes, sir.

"Q. Do you know whether that was with his clinched fist or open hand? A. I think with his clinched fist, but he didn't get to hit me as hard as he hit at me; I kind of ducked like that; he didn't hit me hard. I rather think it was with his clinched fist.

"Q. If you hadn't seen this boy open his knife, would you have fought him any more, you had slapped him with the open hand and staggered him? A. I intended to slap him and that was to be all of the fighting, as I thought that he would stop.

"Q. You had done all of this traveling as this written confession states, and you had burned up your clothes just as that states? You had been excited and you afterwards realized the wrong that you had done? A. Yes, sir.

"Q. You were arrested finally? A. Yes, sir.

"Q. I want you to explain to the jury when you saw him open his knife and you jumped back to give him time to see if he was going to open it, what did he do in the way of opening his knife? A. I can show you the way that he opened it. Give me a match.

"Q. Here? A. (Witness puts match in knife under blade.) He always carried his knife like that on the match. When he went to open it he would do it like this.

"Q. You had seen him carry a knife like this? A. Yes, sir.

"Q. When he made that motion, you knew he was opening his knife? A. Yes, sir.

"Q. Did you mean in that written statement you wanted him to open the knife and was just giving him a chance? A. I didn't know whether he was going to open it or not. I didn't know what he was going to do.

"Q. If when he opened that knife or done that there in the darkness if he hadn't lunged towards you with the knife would you have fought him any more? A. No, sir. After I slapped him, I thought he would quit, then he opened his knife afterwards."

I. The court instructed the jury on murder in the first degree, also on murder in the second degree, and manslaughter in the third and fourth degrees. As already stated the jury found the defendant guilty of murder in the first degree. In due time he filed his motion for a new trial. Two grounds only are assigned for a new trial, to-wit: first, that the court erred in refusing an instruction offered by the defendant relating to the confession of the defendant, and in the instruction which was given by the court relating thereto; second, because the verdict of the jury under the instructions of the court and the evidence in the cause was not warranted, and the verdict at most should have been only for murder in the second degree. The refused instruction number one requested by the defendant was in these words:

"The jury are instructed on behalf of defendant that the written admission or confession of the defendant, offered in evidence, and all verbal admissions alleged to have been made by defendant admitting the crime charged against him must be taken together as a whole, as well that part which makes for the accused as that part which makes against him; and if the part of the statement which is in favor of the defendant is not disproved, and is not apparently improbable or untrue when considered with all the other evidence in the case, then such part of the statement favoring the defendant is entitled to as much consideration from the jury as any other part of such statement."

And the instruction given by the court number six on this same subject was as follows:

"If verbal or written statements of the defendant have been proven in this case, you may take them into consideration, with all the other facts and circumstances proven. What the proof may show you, if anything, that the defendant had said against himself, is presumed to be true, because against himself; but any thing you may believe from the evidence the defendant said in his own behalf, you are not obliged to believe, but you may treat the same as true or false, just as you believe it true or false, when considered with a view to all the other facts and circumstances in the case."

Instruction number six given by the court of its own motion has received the approval of this court ever since the decision in State v. Green, 13 Mo. l. c. 392. It was approved in the exact language of this instruction in State v. Darrah, 152 Mo. l. c. 541, by the whole court In Banc. The instruction number one requested by the defendant is inconsistent with that given by the court in instruction number six and there was no error in refusing the same.

II. This brings us to the real contention in the case, that the evidence did not warrant a finding of murder in the first degree by the jury.

The testimony fails to show an unfriendly feeling existing between the defendant and the deceased prior to the day of the homicide. On the contrary the father of the deceased testified that the defendant often visited his house and so far as he knew the defendant and the deceased were friends. Indeed the circumstances attending the meeting of the young men that evening and the agreement to accompany each other, into the city, all corroborated this view. Why the defendant, a young man five years the senior of this youth of seventeen years and blind in one eye, should have murdered his friend and robbed his person of his pocket book and money and his watch and then secreted the body in the sewer, is of course a question that propounds itself. Looking for a motive we find that the defendant took the pocket book and its contents from the body of the deceased and with the money thus obtained redeemed his overcoat from a pawnshop and pawned the watch for a dollar in the name of the deceased. It would seem almost incredible that a young man who was not shown to be of vicious character, would, for the paltry amount of money to be obtained from the deceased, murder a neighbor boy. These facts are established. Harry Evans was killed by the defendant. The stab in the neck would of itself have produced his death, as he would have bled to death in his helpless condition, but all doubt as to the wound inflicted by defendant with the large rock was removed when the physician, Dr. Williams, testified that the wound inflicted by some blunt instrument, which the defendant says was a stone, was necessarily mortal. While all the circumstantial evidence pointed to defendant as the murderer, his own testimony removed all doubt as to his complicity in the homicide. He accounts for the killing in a most unsatisfactory manner.

John Evans, an older brother of deceased, inquired of defendant if he was going to town, *i. e.,* down into the city, and defendant replied yes, when he had taken some beer home, and requested John and Harry to go with him, but John declined and Harry requested his brother to wait for him. Harry, the deceased, and defendant then went to defendant's home and defendant changed his clothes and they started, talking about going down on Third and Broadway. Deceased objected to going down to the Row and wanted to go to a supper at Mrs. Colley's, and they got into a dispute and one word brought on another until deceased jerked out a knife, whereupon defendant says he slapped deceased in the face. He didn't hit him with his fist, for if he had he would have knocked him unconscious, for defendant had strength, but the stroke knocked deceased down and he got up with his knife and tried to open it and then defendant ran in and took the knife away from him and then began to cut at deceased from right to left and cut him about the neck. When he stabbed him the second time deceased screamed, and fell down and some people came out on their porch, whereupon defendant pulled Harry over into some weeds, and then walked off a little ways and came back and got a rock and knocked him in the head and then threw the knife into the creek and the rock over towards a tree near the creek. He then left and went down into the city and redeemed his overcoat with the money taken from Harry's pocket, came home and then went and tried to hide Harry's body, and threw it into the manhole where it was afterwards found. Neither the jury nor this court are bound to accept this story in its entirety. When Harry's body was found, the only knife he owned was in his pantaloons pocket, under the overall suit, and he had a pair of gloves buckled over his hands.

The jury evidently refused to credit the statement that Harry pulled his knife on defendant and thus provoked him to knock him down. Defendant says he threw the knife into the creek after he stabbed the deceased, but the knife of the deceased was still in his pocket and inaccessible to him, if there was an altercation, because it was under his overalls, and besides he had on heavy gloves on both hands, when his body was taken from the sewer. But the story of an altercation is, to the highest degree, improbable. Why should two friends fall out and fight with knives over a mere disagreement as to where they preferred to go that night?

Deceased had promised his brother to return to Twenty-seventh and Cleveland streets. Having started with his brother to have the latter's shoes mended, it is at least a most unsatisfactory explanation that, without any reference to his agreement to return to his brother, he was willing to fight defendant because the latter did not wish to go to an entirely different place, to-wit, the supper at Mrs. Colley's.

Moreover, defendant made two statements. One was that Harry drew his knife before he knocked him down; the other was that he drew his knife when he got up after he had knocked him down. That defendant intentionally stabbed deceased with a knife his confession leaves no doubt. He says he did it to defend himself, but that he intentionally stabbed him there is no doubt according to his own evidence, and lest the stabbing would not kill him after he had left him helpless, he went back and got the rock and crushed his skull, inflicting what the physician says was a necessarily mortal wound. That the jury were warranted in finding that this wound was deliberately inflicted, we think, cannot be questioned.

If the jury believed, as they have by their verdict said they did, that defendant knowingly and wilfully struck the deceased with a deadly weapon, to-wit, the

large rock, and crushed his skull and thus killed him, they were bound to find he intended the natural consequences of that blow, to-wit, the death of deceased.

This court has time and again approved the definition deliberately given by the criminal court in this case, to-wit, that "it does not mean brooded over or reflected upon for a week or a day or an hour; but it means a conscious purpose to kill, formed in a cool state of blood and not under violent passion suddenly aroused by some real or supposed grievance." After his victim had been rendered helpless by the stabs he had given him and was unable and incapable of following him or doing him any harm, and after he had walked away, he turned about and looked for and found a rock and returned to the helpless boy and proceeded to finish his gruesome work by crushing his brain. Certainly the jury were authorized by this evidence to say he deliberately killed him.

What then is the only contention left defendant? It is that no sufficient or no motive was shown for this deliberate act. The fact of motive or the absence of motive is always an important inquiry in a case of this character, but the absence of an apparent motive is not conclusive of the innocence of the defendant. Experience has demonstrated that the motives for crime are so numerous, so hidden and often so utterly unreasonable that it is impracticable to require the State to make them manifest. It does not follow that there was no motive because the State was unable to show any or that the only one shown would seem inadequate, neither is it true that there can be no murder because there is no motive for it. [State v. Coleman, 20 So. Car. 441; People v. Ah Fung, 17 Cal. 377; Clifton v. State, 73 Ala. 473; State v. Preston, 8 Texas App. 30; State v. Green, 38 Ark. 304; McLain v. Com., 99 Pa. St. 86; State v. David, 131 Mo. l. c. 397-8.]

The jury had before them the evidence that defendant robbed the deceased of his pocket book con-

taining five dollars. While it would seem utterly improbable that a young man, a neighbor and on good terms, would murder a friend for five dollars, the stubborn fact remains he did steal and carry away the pocket book and used the money to redeem his own overcoat from the pawnshop and took and pawned the watch of the deceased. If he had killed his companion in self-defense or had struck him a deadly blow in a heat of passion, upon a lawful provocation, only, why · commit the crime of robbery? If done in self-defense or passion upon provocation, why be at such extraordinary pains to secrete the body of his victim in the manhole of the sewer? Can these facts be reasonably reconciled with the defendant's claim that he killed the deceased in self-defense, or that at most his offense was manslaughter? The criminal court fully instructed the jury on manslaughter in the third and fourth degree and self-defense, but the jury rejected these and found that the killing was deliberately done.

The case in the concrete is this: A youth only seventeen years old, blind in one eye, starts out at night with a neighbor, a young man twenty-two years old; his body is found next morning in a manhole in a sewer, with a stab in his throat, which, without proper medical attention, would have produced death, and in addition his skull was crushed evidently by some blunt instrument, on both hands were new gloves, buckled on, and a small pocket knife in the pocket of his pantaloons, under a pair of overalls; pools of blood are found in different places in the neighborhood. His pocket book which contained five dollars, had been taken, and his watch was missing; when last seen he was in company of defendant, who had agreed to accompany him down into the business part of the city; when the defendant was arrested and called upon to explain what he knew of the homicide, if anything, he makes a statement that he had killed the deceased as the result of a quarrel as to where they should go that night; he confesses that

he knocked the deceased down with his hand, and when the deceased got up he began to draw his knife; he permitted him to do this, and then rushed in and took the knife from him and began to stab at him and struck him with the knife and deceased squealed; this apparently had attracted some people living near by; defendant then dragged deceased into some weeds to hide the body and then left him; after he had gone a short distance, he returned, procured a rock, and with it crushed the head of deceased; he then robbed him of his pocket book and watch; he then left, went into the city, and with a five-dollar bill he found in the pocket book, redeemed his (defendant's) overcoat from the pawnshop and pawned the watch in the name of deceased. Having done this, he returned to the dead body and carried it to a manhole in a sewer and dropped it in; he then went to his home, destroyed the clothing he wore at the time of the homicide; he stated that he could have knocked deceased senseless with his fist alone, as he was strong, yet he stabbed him and crushed his skull with a rock. The evidence abundantly establishes that both deceased and defendant were sober; that deceased had no knife except the one found in his pocket when his body was recovered from the manhole, and he could not have been killed with the knife in his pocket. It further appears that deceased often collected bills for his father, for whom he worked; that defendant was a frequent visitor at the home of deceased; whether defendant knew that deceased collected for his father and would likely have money on his person, was not shown. There is no suggestion of insanity on the part of defendant in the record. That deceased came to his death by violence at the hands of the defendant was fully established; that he intentionally killed deceased, the jury were fully authorized to find from the evidence that defendant used a deadly weapon upon the deceased after he had time to fully form the design to

kill him and at a time when deceased was incapable of offering him any lawful provocation for so doing.

The criminal act and the connection of defendant with it having been established beyond any reasonable doubt, the act itself will allow the inference of a motive, whether that motive is made to appear or not. Says Burrill on Circumstantial Evidence, page 297: "Where a man, in his senses, deliberately plunges a knife into the breast of another, or strikes with a weapon which he knows must kill, the law does not stop to inquire into the intent, but justly infers it from the act itself, which shows, upon its face, a will or design to take life. Much less does it attempt to go farther back in the inquiry by seeking for the *motive* which may have originally prompted the act," etc.

Gruesome as are the facts developed on this record, unnatural and unnecessary as this homicide was, we think the evidence fully justified the verdict of the jury. We find nothing in the testimony indicating that the jury were swayed by passion or prejudice. The instructions are such as have often met the approval of this court and the judgment and sentence of the court must be and is affirmed, and accordingly the sentence which the court pronounced must be carried into effect.

*Burgess* and *Fox, JJ.,* concur.