## THE STATE v. E. M. BAKER, Appellant.

### Division Two, December 10, 1912.

1. **JURISDICTION: Want of to be Affirmatively Shown: Appeal.** The rule that want of jurisdiction must be affirmatively shown extends to the manner of organizing and opening court, and accordingly the Supreme Court refuses to consider appellant's contention that the record in this case does not show that the order made by the judge of division one of the Jackson County Criminal Court, requiring the judge of division two to open a term of court, was put in writing or served on the judge of division two as required by law.

2. **CONTINUANCE: Appeal: Record.** The propriety of refusing a continuance is not legally before the Supreme Court, where the bill of exceptions does not show the application therefor, and does show that the defendant answered ready when the case was called.

3. **EVIDENCE: Homicide: Insanity: Collateral, Kindred.** Evidence as to the insanity of collateral kindred of the defendant in a homicide case is not relevant under the defense of insanity.

4. ——: ——: ——: ——: **Cumulative.** The showing in evidence that an aunt of defendant was insane rendered unnecessary all cumulative evidence as to others of his aunts and uncles, and precludes a ruling as to whether such aunts and uncles are defendant's collateral kindred in the sense conveyed by the rule of exclusion.

5. ——: ——: ——: ——: **Non-Expert's Opinion.** Where the facts are in evidence upon which a non-expert witness based an opinion as to the insanity of defendant's grandfather, and the erroneous exclusion of the opinion itself did not materially weaken the effect of the evidence, such exclusion does not call for the reversal of this conviction of defendant for murder.

6. ——: ——: ——: ——: **Harmless Exclusion.** In this prosecution for murder, to which the defense of insanity was interposed, the exclusion of testimony of family tradition that the mind of defendant's grandfather, who lived to be eighty or ninety years old, had been bad for years, and that he lost his mind and had to be taken care of toward the last, was not reversible error. There was other evidence that quite a number of years before his death his mind failed, and, aside from that, it was no serious impeachment of defendant's sanity that his grandfather's mind failed at an advanced age.

7. **INSTRUCTIONS: Murder.** An instruction in a murder case is not erroneous because it reads: "and by the means and in the manner charged in the indictment and explained by instructions . . . herein."

8. ——: ——: **State v. Duestrow.** Instructions in a murder case based upon those in State v. Duestrow, 137 Mo. 44, are upheld.

9. ——: **Convicted of Murder: Manslaughter.** A defendant convicted of second degree murder cannot complain of an instruction given on the subject of manslaughter.

10. **ATTORNEYS: Improper Remarks in Argument.** Where an attorney for the State made improper remarks to the jury in his argument, and withdrew them, only to make others of like kind and again withdraw them, the Supreme Court affirms the judgment convicting defendant of murder, only because there are no serious doubts in the minds of the court, arising out of the evidence, as to defendant's guilt.

11. **JURORS: Competency.** Taking their examination as a whole, as it is set out in the statement of this case, two jurors are *held* competent in a prosecution for murder to which the defense of insanity is interposed.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield*, Judge.

AFFIRMED.

*Boyle & Howell, Joseph S. Brooks* and *Langsdale & Howell* for appellant.

(1) The court erred in sustaining objections to the questions asked of E. J. Smith, relative to the grandfather and other near relatives of defendant. Baldwin v. State, 12 Mo. 223; State v. Schaefer, 116 Mo. 101; State v. Bryant, 93 Mo. 273; Appleby v. Brock, 76 Mo. 317; Moore v. Moore, 67 Mo. 195; Crowe v. Peters, 63 Mo. 434; State v. Speyer, 194 Mo. 459; State v. Duestrow, 137 Mo. 87. (2) The court erred in sustaining objections to the questions asked of J. W. Stephenson, relative to Nancy Smith, an aunt of defendant, and other near relatives of defendant. Authorities under point 1. (3) The court erred in sustaining the objections to the questions asked D. F. Baker. Matters of family history are exceptions to the hearsay rule. The necessity principle applies. 2 Wigmore on Evidence, Secs. 1480, 1481, 1502; Vowles v. Young, 13 Vesey, 140. (4) The court erred in giving instruction 12. It is vague and indefinite, and was confusing and misleading. It permitted the jury to find the defendant guilty of murder or manslaughter on the same state of facts and further failed to prescribe what degree of murder. It was further erroneous in directing the jury's attention to the indictment and other special instructions for the facts upon which to base its verdict. Besides the general doctrine announced by the instructions is contrary to law. State v. McCasky, 104 Mo. 644; Andjins v. Hartman, 196 Mo. 539; Glasgow v. Railroad, 191 Mo. 347; Webb v. Carter, 121 Mo. App. 147; Jordan v. Transit Co., 202 Mo. 418; State v. Chambers, 87 Mo. 406;

State v. Scott, 109 Mo. 226; State v. David, 131 Mo. 380. (5) Instruction 13, given on behalf of the State is erroneous. It incorrectly states the law. It further directs a verdict against the defendant without telling the jury of what offense they should find him guilty. It does not require that the act should have been done wrongfully, premeditatedly, with malice aforethought or deliberately, but uses in lieu thereof the words "as charged." Authorities under point 4; State v. Parker, 172 Mo. 191; State v. Marsh, 171 Mo. 523.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

ROY, C.—Under an information charging murder in the first degree, the defendant was convicted of murder in the second degree and sentenced to fifteen years in the penitentiary, and has appealed.

The defense was insanity. The evidence for the State tended to show a strong case of "wine and woman." Prior to his acquaintance with deceased, the defendant was an apparently prosperous contractor and builder in Kansas City. He had a family consisting of a wife and three children, of whom a son and daughter were grown. The son was married and worked with the father. The two daughters were at home. Defendant was attached to his home and family. He lived in a house belonging to the wife. It was encumbered. About four years before the trial he met Ruby Hirsch, the deceased, who was about eighteen years old, and illicit relations between them began at once. He became infatuated with her, and, according to his statement, gave her forty or fifty dollars a month. When his bounty slackened, she threatened him that she would reveal the situation to his wife. She sued him for $8000 as damages for an assault. He had the house where she lived raided

by the police, and she was fined twenty-five dollars as an inmate of a bawdyhouse. The suit against him was then dismissed for want of prosecution. Their relations continued. He became more and more addicted to liquor. His business, to a large extent, left him, or was neglected. He borrowed small sums of money to satisfy her demands, and suspected her of using the money he gave her in keeping up other men. She went on a visit to Topeka. He sent her ten dollars to pay her expenses home. When she arrived in Kansas City, at his request, she made an appointment to meet him, and failed to keep it.

The evidence for the State was to the effect that he corresponded with her through a saloon, and that on the night of the killing he put a pistol in his pocket, went by the saloon, got one or more drinks, and went to the flat occupied by Ruby Hirsch and her mother.

A witness, Emil Myer, testified that when defendant reached the Hirsch home, the witness had been there about two hours, and had gone into the bath room adjoining the front room, when the defendant called; that the bath room door was slightly open; and that the defendant, on coming into the front room, said to Ruby, "You done me dirty," and she said, "No, I didn't. Mama wanted me to stay here." That defendant said, "Where's that ten I sent you?" She said, "If that is what you want, I will get that for you and you can go." That then defendant pulled a pistol from his pocket and fired at her five times. She fell unconscious and was taken to the general hospital, where she died the following night of her wounds.

The defendant, in a statement made by him the morning after the killing and while under arrest, said that he remembered putting the pistol in his pocket and taking a drink at Riddle's saloon the night before, but that he did not remember what occurred after that.

The mother of Ruby Hirsch testified that she was on the back porch and heard a shot fired and heard Ruby scream, then heard four more shots, and when witness got into the front room she saw Ruby lying on the floor and the defendant standing over her, pointing the pistol at her. She did not remember what was said by either her or the defendant. The witness ran out calling her other daughter and left defendant standing there. When she got back, the defendant was gone. About four o'clock the next morning, he passed across from the opposite side of the street to his house, barefoot and hatless, in his shirt sleeves, and was arrested by the officers who were waiting for him. His discarded clothing was found a few blocks away between the sidewalk and the street in the weeds which were mashed down and "looked like he had been wallowing around there."

The defendant was born in Scotland county, Missouri, and lived there until about thirteen years of age, going with his family in 1878 to the vicinity of Phillipsburg, Kansas, where the family lived on a farm. He was badly afflicted with asthma until he left Missouri and had frequent spells of suffocation on account of that affliction, and was known to wake at night and try to climb the walls of the room. His asthma disappeared after he went to Kansas; but the evidence of his brothers and sisters showed that he had spells of melancholy, and was weak and unable to work for a large part of the time while in Kansas.

His mother, according to the evidence of the family and relations, was weak and nervous, and died of paralysis at the age of forty-six. By reason of the paralytic stroke she was bedridden for two years. She had asthma all her life and was a great sufferer from it. She had spells of smothering and of sick headache every few days. She would at some of those times say "you children don't look right to me." She was mentally all right when she did not have those choking

spells. While in such condition she was conscious but could not talk. One of her sons, John, testified that she was nervous and had heart trouble and smothering spells in which she would pass away just like somebody dying, and would come to with a grip and jerking, with eyes set back like a dead person, and her mind would wander, and she would say, ''This is not my home.'' A nephew of hers testified that she was ''weakly, nervous, excited and broke down.''

Defendant's father died at about eighty years of age, having been paralyzed about seven years. One of his sons and a daughter testified that prior to his paralysis he was a robust, strong man. The daughter said that he had a fainting spell once while chopping sunflowers out of the corn.

The defendant had two sisters and three brothers who lived to be grown. All were afflicted with asthma in their childhood, the most of them getting better of it as time went by. Albert, one of the brothers, died at the age of forty, some of the witnesses saying that he died of asthma, and others that he died of consumption. John, another brother of defendant, lives in Oklahoma. He testified that he had one hard spell of asthma after going to Kansas and that it still affects his heart and that it appears like it is going to stop beating.

Another brother of defendant, W. F. Baker, fifty-six years old, was a witness at the trial. He suffers from asthma, but appears to be otherwise in good health.

Two sisters of defendant testified by deposition. Both suffered from asthma. One got relief after moving to New Mexico. The other still suffers from it. She had spells or spasms until about fifteen years old. Since then she has spells with her heart and with asthma. She is very nervous. A nephew of defendant who is a son of his brother John, at the age of twenty-three had a spell of typhoid fever, with

complications of asthma, and was in the insane asylum of Oklahoma from September to April.

H. C. Baker, a paternal uncle of defendant, lived to the age of eighty-eight. During the last five or six years of his life, his mind failed him, so that he would run away from his home, tear up his bedding, etc.

Frank Baker, an uncle of defendant, had two sons Marion and Wash who were shown to be poor business men, and who acted in a peculiar and erratic manner. George Baker, a grandson of Frank Baker, and a second cousin of defendant was an idiot.

Nancy Smith, a paternal aunt of defendant was adjudged insane in 1903 in the probate court of Scotland county. She had a daughter, Jennie, who, as the evidence tended to show, was weak minded. The defendant's paternal grandfather had been married three times and had eighteen children. A witness stated that "quite a number of years before his death he didn't know his own folks. He didn't know his children at times and wanted to go home. He would get away and couldn't find his way back."

E. J. Smith testified by deposition for defendant, stating that he knew John Smith, defendant's grandfather, for thirty or forty years, beginning when he (Baker) was about fifty. He was then asked whether John Baker during the last years of his life was of sound or unsound mind. He answered that " it was unsound." He was then asked, "What, if anything, caused you to form that opinion," and answered, "Quite a number of years before he died, he didn't know his own folks. He didn't know his children at times and wanted to go home. He would get away and couldn't find his way back."

At the trial the answer of the witness stating that John Baker was of unsound mind was, on objection of the State, excluded; but the answer to the subsequent question was read in evidence. The following

from the deposition of D. F. Baker, a cousin of defendant, was offered by defendant and excluded by the court:

"Q. State whether or not you have heard members of your father's family discuss the mental condition of your grandfather, John Baker. A. Yes. I heard them talk about them.

"Q. State if you know what the family history was upon that suggestion. A. Well, they claimed his mind had been bad for years and towards the last that he got so he lost his mind and had to be taken care of."

As to the sanity of Marion Baker, a son of Frank Baker, and a second cousin of the defendant, Mr. E. L. Clark, who had been sheriff of the county and was a second cousin of Marion, stated Marion would talk at random and would go to Iowa and leave his growing crops which his father would have to care for. D. F. Baker, a brother of Marion, testified by deposition that he did not think Marion was of a thoroughly sound mind, because of the way he conducted his business; that he had left a growing crop of corn and his stock and gone to Iowa and stayed all fall and winter, and his father had to attend to those things for him. That testimony of D. F. Baker was on the motion of the State excluded.

On the same question, E. J. Smith testified by deposition (referring to Marion Baker), "I didn't think he had a sound mind. In fact he wasn't capable any time. Neither Wash or Marion was capable of transacting their business. They ran through with everything their father gave them." On objection of the State, all that was excluded except the first sentence.

J. W. Stephenson testified by deposition as follows: "He (Marion) was about the same as Wash. He couldn't manage his business. His father always had to transact the business on his farm and keep the

run of things." Which evidence was excluded on behalf of the State.

As to the sanity of Wash Baker, a son of Frank and a second cousin of the defendant, the record is as follows:

J. W. Stephenson testified by deposition, "I never thought he (Wash) was bright, didn't think he was exactly right. Well, I don't know as I could describe his action. He acted kinda curious, kinda silly minded." The first sentence of the above was excluded on objection of the State.

E. J. Smith by deposition testified that Wash was of unsound mind and that witness formed that opinion from his dealings and transactions of business.

D. F. Baker, a brother of Wash, testified by deposition: "Well, I didn't consider him [Wash] of a sound mind. My father bought a little place down east of town that he first lived on and assisted him and looked after his business practically while he lived, up to his death, and succeeded in keeping that property in his name, but after he died he soon ran through with all he had."

That evidence of D. F. Baker was on the State's objection excluded.

E. L. Clark testified, "His [Wash's] speech was rambling. He did all kinds of tricks. He had a sore leg and would show it to people who did not want to look at it. He was forty-five or fifty years of age. Always doing pranks that no one cared to see, standing on his head, standing against the wall and trying to stoop over without bending his knees. Did it so often that people made light of it. You could make fun of him to his face and he wouldn't realize it. He had a man prosecuted, and the judge couldn't keep him from saying what he wanted to say."

On the question of the sanity of Frank Baker, a paternal uncle of the defendant, J. W. Stephenson,

testified by deposition, ''I don't think his mind was right.''

On objection of the State it was excluded. The witness stated no facts on which he based his opinion, except that he was acquainted with Frank Baker.

E. L. Clark, a relative who had been sheriff of Scotland county, after stating that H. C. Baker, who died at the age of about eighty-eight years, for five or six years before his death would get lost and tear his bed clothing, and could not understand what was told him, when asked whether any of the brothers of H. C. Baker were other than normal, rational people, said, ''No, sir.''    Frank Baker was a brother of H. C. Baker.

There was evidence of many witnesses that defendant, prior to the killing, was of a melancholy disposition and sometimes forgot things that had recently occurred until he would be reminded of them, and that he walked stooping forward, not noting persons and things around him.

A large number of witnesses testified that prior to the last few years the defendant was an active, alert, clear-headed business man.

The defendant did not testify, but his statement made the morning after the killing was read in evidence.

On the 24th of January, 1911, the court overruled defendant's application for a continuance and set the case for trial on January 30, 1911, on which date the defendant announced ready for trial.

On his *voir dire,* juror J. H. Moberly said, ''If a man is insane he should be punished some way, probably not entitled to capital punishment, death, or anything of that kind, but if he is insane, then I consider him an improper man to run at large and be among the community; that he might damage others. He should be sent to the penitentiary or some other place.''

"Q. Suppose the instructions of the court said to you if you believed he was insane at the time of the homicide being committed, and had since recovered, that you should discharge and acquit him. A. After he was proven insane?

"Q. Yes. A. I would not be very strong in favor of turning him loose.

"Q. So that, when you get down to the last analysis of the situation, you entertain rather a strong feeling against the defense of insanity in murder cases, don't you? A. Yes, sir; I am not very favorable to those cases. I am not prejudiced against these people. They have my sympathy, but the outside world has my sympathy, and I would not be in favor— after they commit murder, kill somebody, I don't think they should have a chance to do it again. I have some prejudice against the defense of insanity.

"Q. Is your prejudice directed against a bogus defense of insanity, or does it apply to an insanity defense honestly interposed as well? A. Well, it is mostly against a bogus defense. It is all against a bogus defense. I would consider an insanity defense honestly interposed, and would give the evidence such weight as the law would tell me I ought to give, and I would follow the instructions of the court in such a case. I would be inclined to think such a defense was bogus, until they showed me the contrary. If the defendant's insanity is established to my reasonable satisfaction, I would follow the instructions of the court.

"Q. I want you to answer me this question without any 'if's.' Are you absolutely sure you can give the State and the defendant a fair and impartial trial? A. I could do it, but I would rather not sit on this case. I am sure I could give them a fair trial."

Juror Forbes stated that he could give the State and defendant a fair trial. "Q. Any doubt about it? A. I say if— Q. Don't talk to me about 'if's.' I want

to know if you are absolutely sure you can give to the State and this man a fair and impartial trial? A. I know I could do that according to the evidence. I am not prejudiced. I am not very favorable towards those cases of insanity. I am unfavorably opposed to turning them loose to do something else of a similar character. If there was evidence that he was insane, I wouldn't like very much to see him turned loose. I would be afraid of him. Q. Even if shown by the evidence, to your reasonable satisfaction that he had since recovered from it, you would be afraid he might have another spell of insanity, and you would hate to turn him loose then? A. We have places to keep those people and they should not be running at large. Q. If he has recovered since the homicide, how would you feel about it? A. Well, there might be a strain of insanity that he would be a dangerous man loose. Q. And you would be in favor of locking him up anyhow? A. Well, I suppose that would be left to the court to decide what to do about it.''

The defendant's challenge of those two jurors was disallowed, and Mr. Moberly was left on the trial panel.

Counsel for State in their arguments used the following language:

(Mr. Jacobs) ''It is a remarkable fact that when a crime is so inexcusable, when no justification and no defense can be found for it, it is a fact that when every source known to clever counsel has been exhausted they always and invariably take their stand upon that worn-out and threadbare ground of insanity and mental derangement.''

(Mr. Jost) ''I want to say to you as God is my judge, if I had the decision of this case myself, if I could say the word that would pass the judgment it would be a judgment of guilty. I say it on my con-

246 Mo.—24

science and my honor." Also: "The proper thing here is second degree murder. This man is guilty of it, if there ever was a criminal brought to the bar charged with the crime, he is guilty. . . . "

On objection the last statement was withdrawn.

"Mr. Jost also said: "And now, gentlemen of the jury, let me say this much, and I say it on my honor as a man, I say it on my conscience, I say it to you, gentlemen of the jury, because I believe it to be true, this man is guilty of murder and he ought to be convicted.

"I say, men, that this further consideration is to be urged here. There is a limitation upon the prosecuting attorney and I have got to observe it, and it would be unfair and improper for me not to observe it, but I can say this much, men, and still be within the limits of my privilege, that the only evidence of this man that you have comes from witnesses who are acquainted with him and from no other source; and the only statements of this defendant that is before you, is the written statement here in evidence. I say that—and I am still within my privilege when I say, that the only utterances of this defendant that you have got here to consider is the written statement of his here, taken by Capt. Whitsett. . . .

"Mr. Boyle: If your Honor please, I want to make an exception to that argument of counsel as it does by indirection that which the law forbids him to do by direction, as it is an indirect statement to the jury that the defendant hasn't spoken. . . .

"Mr. Jost: It is no such thing.

"The Court: I will sustain the objection and withdraw the remark from the jury.

"Mr. Jost: Very well, I will withdraw that.

"The Court: That statement of the attorney for the State is withdrawn from the consideration of the jury and you will not consider it in arriving at your verdict.

"Mr. Jost: Very well. Then I will say this much. I can at least say this much: that the only attack on this statement that the defendant made is by some one else.

"Mr. Boyle: If your Honor please, Mr. Jost has again. . . .

"Mr. Jost: I will withdraw it. I want to get through. I want to get through this argument.

"Mr. Boyle: I am not going to simply permit you to dispose of my objection by a wave of the hand. I have certain rights I am going to maintain.

"Mr. Jost: I will withdraw it.

"Mr. Boyle: You can't inject ·poison and then take it out that way. You know this defendant has some rights. I am objecting to the statement of Mr. Jost, as made here, as he again does ·the same thing your Honor admonished him about a moment ago.

"Mr. Jost: I am going, I haven't.made any statement, I withdraw it. There is not anything before the court.

"The Court: Proceed."

The court gave an instruction on manslaughter in the fourth degree based on an involuntary killing, and refused one on the same subject asked by defendant based on a voluntary killing.

Appellant criticises the following portion of instruction numbered 12 given for the State: "Therefore, if you believe and find from the evidence, that the defendant, under the circumstances, and while being in the condition aforesaid, and by the means and in the manner charged in the indictment and explained by instructions numbered 1, 2 and 3 and 3-a herein, shot and killed Ruby Hirsch, then you will find the defendant guilty of murder or manslaughter in the fourth degree."

The record fully shows the opening of the criminal court of· Jackson county at its April term, 1910, at· which term the information was filed. There was

a continuance to the October term and again to the January term, 1911, when, on application of defendant, he was granted a change of venue to Division Two of that court.

On January 2, 1911, the following entry was made of record in said criminal court: ''Now at this day the Honorable Ralph S. Latshaw, judge of Division One (1) of the criminal court of Jackson county, Missouri, files notice in writing to Honorable E. E. Porterfield, judge of Division Two (2) of the criminal court of Jackson county, to open said Division Two of the criminal court of Jackson county, in compliance with Sec. Two (2), page 210, Session Acts of Missouri, 1907.''

The bill of exceptions shows that the trial was in Division Two of the court.

I. Appellant makes the point that the record does not show that the order made by the judge of Division One was put in writing or served on the judge of Division Two. We will not go into a discussion of the provisions of the Act of 1907 (Laws 1907, p. 209). We simply reaffirm the salutary rule that want of jurisdiction must be affirmatively shown. It will not be presumed from the mere failure of the record to speak on that subject. [State v. Baty, 166 Mo. 561; McClanahan v. West, 100 Mo. 309.]

And State v. Baty, supra, is authority for the proposition that such presumption is in favor of the valid organization and opening of the court, as well as of the jurisdiction over the subject-matter and the parties.

II. The bill of exceptions does not show the application for a continuance, but does show that the defendant announced ready when the case was called for trial on January 30. The propriety of the court's action in refusing a continuance is not legally before us.

III.　Under the ruling of this court in State v. Soper, 148 Mo. l. c. 234, and State v. Pagels, 92 Mo. l. c. 307, evidence as to the insanity of collateral kindred is not relevant under the defense of insanity. The court did not err in excluding evidence as to the mental condition of the cousins and other collateral kindred of the defendant. Much of that kind of evidence was introduced, of which the defendant got the benefit. As to whether uncles and aunts are collateral kindred in the sense here under discussion we will not undertake to say, as the evidence shows that in 1903 Mrs. Smith, defendant's aunt, was adjudged insane. Such fact made all cumulative evidence on that subject unnecessary.

IV.　It will be noticed from the statement of facts that the trial court admitted that part of the deposition of E. J. Smith which stated the facts which he observed with reference to the condition of the mind of John Baker, defendant's grandfather, in the last years of his life, he having lived eighty or ninety years; but excluded the statement that his mind was *unsound*. From reading the record, we infer that the trial court distinguished between *insanity* and *unsoundness*; and excluded that answer because he used the word *unsound* instead of the word insane. However that may be, the facts on which the excluded opinion was based are in evidence; and those facts contain in themselves the opinion of the witness. The witness stated, "He didn't know his own folks. He didn't know his own children at times and wanted to go home. He would get away and couldn't find his way back." It was said in Huffman v. Huffman, 217 Mo. l. c. 230, that the facts upon which the nonexpert's opinion is based are the principal element of the testimony, and the opinion of the witness is only a secondary matter. The opinion of the witness should have been admitted, but its exclusion under the circum-

stances did not materially weaken the effect of the evidence.

V.   We shall not decide the question as to whether family tradition is admissible as evidence on the question of the sanity or insanity of a deceased ancestor. The court excluded the evidence of D. F. Baker as to the family tradition that John Baker's mind had been bad for years and that towards the last he got so bad he lost his mind and had to be taken care of.   The evidence in the case shows that John Baker was married three times and was the father of eighteen children and died at eighty or ninety years of age.

There was other evidence in the cause that "quite a number of years before his death" his mind failed.

Conceding for the moment the competency of family traditions, the exclusion of it in this case was under the circumstances not reversible error.   It certainly is no serious impeachment of the defendant's sanity that his grandfather had at that extreme age "fall'n into the sear, the yellow leaf."

VI.   Appellant makes the point that instruction numbered 12 for the State refers the jury to the indictment and other instructions for the facts upon which to base their verdict.   The language of the instruction is "and by the means and in the manner charged in the indictment and explained by instructions numbered 1, 2 and 3 and 3-a herein."   The use of the word "indictment" instead of information is of no importance.   If the instruction had referred the jury to the indictment or information for the facts charged and there stopped, it would have been error.   It adds "and explained by instructions," etc.   It is true that instruction does not tell the jury of what offense they may convict the defendant.   It leaves that matter to the other instructions which clearly distinguished between the facts necessary to constitute the different

degrees of the offense charged. Instruction 13 for the State did not undertake to distinguish the degrees of the offense, but was confined to the question of motive.

Many criticisms of the instructions are made by the appellant, but we find that they are taken almost bodily from State v. Duestrow, 137 Mo. 44. Such changes as were made were properly made to fit the facts of this case. ⋅

VII. The facts of this case distinguish it from State v. Speyer, 194 Mo. 459, in which there was an instruction on manslaughter. In this case the court instructed on manslaughter in the fourth degree based on an involuntary killing and refused an instruction asked by defendant on manslaughter in the fourth degree based on a. voluntary killing. In our opinion there was no manslaughter in the case.

A stereotyped instruction is as follows: "He who wilfully, that is, intentionally, uses upon another, at some vital part, a deadly weapon, such as a loaded pistol, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this, must be presumed to intend death, which is the probable consequence of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart." [State v. Duestrow, supra.].

There was no pretense of any provocation or justification or excuse in this case. The jury found in effect that he was not insane. The defendant cannot complain of the instruction given on the subject of manslaughter, as he was not convicted of that degree of the offense. [State v. Privitt, 175 Mo. 1. c. 231.] There was no evidence to support the instruction asked by him on that subject.

VIII. The remarks of Mr. Jost in his argument to the jury calling attention in an indirect and covert way to the failure of the defendant to testify were improper. Surely the representative of the State who pursues a violator of the law should be willing to keep within the certain limits of that law. In this case the language was withdrawn by Mr. Jost and by the court, and the jury were told to disregard it. The worst of it all was the immediate repetition of the offense, but that was followed by an immediate withdrawal by counsel of the language used.

No case has yet held that remarks of counsel in argument which were withdrawn by counsel constituted reversible error. We are not willing under the facts of this case to so hold. In the Spivey Case, 191 Mo. l. c. 112, and in the Deitz Case, 235 Mo. 332, counsel repeatedly offended in this respect and disregarded the cautions of the court. In this case counsel withdrew his remarks. We do not mean to say that a withdrawal will in all cases cure the error.

The act of counsel for the State in calling God to witness the sincerity of his belief in the guilt of the defendant was out of place. Every effort to substitute the opinions of others for those of the jury as to the guilt of one accused of crime is to be strongly condemned.

If there were serious doubts in our minds, arising out of the evidence, as to the defendant's guilt, we would reverse the case on account of the misconduct of counsel. We affirm the case because we are satisfied the same result would have been reached in any event.

IX. The examination of the jurors Moberly and Forbes shows that they were men of intelligence and disposed to follow the line of their duty under the instructions of the court. The defendant's counsel seem to have been so impressed with Mr. Moberly's

attitude that they left him on the trial panel.  Of course that did not deprive defendant of his right to insist upon the point here.  Taking their examination as a whole, we think they were competent jurors.

The judgment is affirmed.  *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court.  All the judges concur.