THE STATE v. ROSCOE F. WARREN, Appellant.—33 S. W. (2d) 125.

Court en Banc, November 25, 1930.

*Ira B. McLaughlin* and *George V. Aylward* for appellant.

*Stratton Shartel,* Attorney-General, and *A. M. Meyer,* Assistant Attorney-General, for respondent.

DAVIS, C.—Pursuant to a four-days' trial in the Circuit Court of Jackson County, defendant was convicted by a jury of murder in the first degree as charged in the indictment, and his punishment assessed at death. He appealed from the judgment entered on the verdict.

The record establishes that this case was here previously on appeal, and that it was reversed and remanded for a new trial (State v. Warren, 317 Mo. 843, 297 S. W. 397). Consequently, we refer to the opinion of BLAIR, J., for a detailed statement of the facts. However, as the errors now assigned are unlike the errors assigned on the prior appeal, a plenary statement of the facts is unnecessary.

The evidence adduced on the part of the State warrants the finding that, on October 13, 1924, in an attorney's office in the Scarritt Building, in Kansas City, Jackson County, during the reading of a resolution by deceased formulated by the trustees of the Mutual Rocky Mountain Club, which resolution was designed to oust defendant as general manager of the club, and which stated that defendant's management of the club had been unprofitable, wasteful and extravagant, and that defendant, as agent and general manager of said club, had diverted assets, funds and properties of said club to his own personal use, defendant shot and killed John C. Deskin. Defendant was the organizer of the club, and Deskin, one Towner and another were the trustees appointed by the common-law-trust organization agreement. Later one Housh became a trustee in place and stead of the unnamed trustee. The membership of the club was limited to Masons. The purpose of the club was to maintain and operate hunting lodges in the West, and it acquired, among others, the property known as Pahaska Tepee, in Wyoming, near Yellowstone Park, the former hunting lodge of "Buffalo Bill."

It seems that one Clubb had loaned the Rocky Mountain organization the sum of $25,000. Defendant, for the club, borrowed about $11,000 from his cousin. In addition, club memberships were valued $150, and defendant had sold about four hundred at that price. Some time prior to the killing of Deskin, Housh, in a letter written to a member of the club, stated that defendant was guilty of embezzlement of the club funds. Later Clubb, Housh and the other trustees decided to have an audit of the affairs and books of the club. On Monday morning, October 6, 1924, the above parties with defendant and the club's attorney met at the office of the club. As the audit was not completed, the meeting adjourned until the afternoon, when it was furnished. Nearly all of the parties procured attorneys to represent

them, except defendant. During the remainder of the week, except probably Saturday, the parties, attorneys and an accountant representing Clubb, met at the office and examined defendant with respect to the statement and the audit. The examination of defendant and the affairs of the club apparently failed to show a misappropriation of the funds. While nothing particularly was said, a feeling of antagonism appeared to exist between Housh and defendant. The result of the examination of defendant and the affairs of the club appeared to be satisfactory, at least they so appeared to defendant, and no further meetings were arranged. On Monday, October 13, 1924, Mr. Barnett, attorney for the club, between one and two P. M., was called on the telephone and advised that a meeting was in progress, and he was requested to be present. On advising the caller that defendant was then in the office, Mr. Barnett was told that progress would be made with defendant absent, but that he could come if he desired. Mr. Barnett, advising defendant to wait in his office, proceeded to the meeting. Deskin commenced to read the resolution, when defendant and his son appeared. Chairs were provided for them, and defendant seated himself, appearing, as may be said, calm and normal. Noting the presence of defendant, someone suggested that the resolution be read from the beginning. On Deskin reading it, the demeanor of defendant was seen to change as Deskin progressed, and defendant became ashen, pale or white. When Deskin reached that part of the resolution which said that defendant had diverted the assets, funds and properties of the club to his own use, defendant arose to his feet and exclaimed: "It is a damnable lie;" whereupon defendant fired four or more shots from an automatic, one of which hit Deskin in the head and another in the arm, resulting in his death. Immediately thereafter and during the confusion, defendant proceeded to the foyer of the office suite; there he placed the pistol to his temple, and it was heard to click once or twice, but immediately thereafter he pointed it at his side and fired it, the bullet entering to the side of the hear. and puncturing the left lung. Both Deskin and defendant were taken to the hospital, where Deskin died the next day, but defendant recovered. The defenses of defendant were insanity and self-defense. Other facts, pertinent to the issues discussed, will be adverted to in the opinion. It may be well to state that all italics, found in the opinion, are our italics.

I. Defendant's son, Neale, testified for the defense, and denied on cross-examination that, on the morning of October 13, 1924, prior to the homicide, he said anything to his father relative to carrying a loaded revolver, or remonstrated with him or commented on it, or undertook to disarm him on that morning. He stated that he asked his father for a gun, and he gave it to him. He denied any physical force. He further denied that he disarmed his father that morning, or that his

father told him he was going to kill Deskin or some other member of the trustees of the club. He denied making such statement to either Detective Elder or to any prosecuting attorney. Neale Warren answered a question thus: "I think I told him I took a gun away from my father, or rather that he gave it to me when I asked him for it. They might have understood me to say that I took it away from him, but it was just that I asked him for the gun and he gave it to me." Finally he said he could not be absolutely sure, they might have misunderstood him, but he did not think he made any such statement. On redirect examination, he said that he made a written statement at the prosecuting attorney's office. This written statement was not introduced in evidence.

In rebuttal, the State offered Judge Smith as a witness, who testified that Neale Warren verbally stated to him that he had disarmed his father the morning of October 13, 1924, prior to the shooting of John Deskin; that Neale hid the gun and later found it had disappeared, and that he later overtook his father at Barnett's office.

The testimony of Judge Smith, relating to the statement made to him by Neale Warren, was not original or substantive proof of the actions of defendant, but it was hearsay. The testimony of Smith was admissible, however, to impeach Neale Warren. Consequently, the effect of Smith's testimony should have been limited to such purpose by an instruction. Defendant offered such an instruction, reading: "The court instructs the jury that you must not consider any verbal or written statement which you may believe from the evidence was made by any witness in this case, outside of court, and which you may find inconsistent with such witness's testimony on the witness stand, as tending in any way to establish the truth of any element of the offense charged in the indictment."

We think that the instruction, or one similar in import, should have been given, and that the trial court therefore erred. The jury should have been told explicitly by a proper instruction, as defendant offered one on the concept, that such evidence could not be considered by them as substantive evidence tending to show defendant guilty of any crime. On this subject, in State v. Thomas and Allen Swain, 68 Mo. 605, l. c. 616, the court say: "The jury should have been very pointedly told that the testimony of Archer, so far as being evidence against the defendants, was to be entirely excluded from their consideration; that its only purpose was to impeach the statement of Curry, and could have no other effect whatsoever. The instruction asked by defendants on this point was altogether unobjectionable, and should have been given." [State v. Little, 228 Mo. 273, 128 S. W. 971; State v. Bersch, 276 Mo. 397, l. c. 416, 207 S. W. 809; Chawkley v. Railroad, 317 Mo. 782, l. c. 801, 297 S. W. 20; 16 C. J. 855; 14 R. C. L. 791-2.] A reading of the instruction offered in this case shows nothing objectionable in it, although we think that, for the purpose intended,

it could have been couched in language that would have been plainer to the jury. In any event, in criminal cases, as defendant offered an instruction on the subject, it was the duty of the court to formulate a correct instruction. [State v. Hendricks, 172 Mo. 654, 73 S. W. 194; State v. Lowe, 93 Mo. 547, 5, S. W. 889; State v. McKenzie, 228 Mo. 385, 128 S. W. 948; State v. Moore; 160 Mo. 443, 61 S. W. 199; State v. Clark, 147 Mo. 20, 47 S. W. 886; State v. Reed, 154 Mo. 122, 55 S. W. 278.]

II. An instruction for the State, involving insanity, in part reads: "Wherefore the court instructs the jury that if they find and believe from the evidence that *at the time he committed the act charged in the indictment* the defendant was so perverted and  deranged in one or more of the mental and moral faculties as to be incapable of understanding *at the moment he killed John C. Deskin as charged against him,"* etc.

Defendant did not take the stand nor testify, nor did he judicially admit that he shot and killed Deskin. It is true that the testimony of some of his witnesses tended to show that he did shoot and kill Deskin. It is also true that he submitted the defense of insanity. Notwithstanding these circumstances, all of the instructions predicating a verdict should have required a finding that defendant shot and killed Deskin (State v. Jordan, 306 Mo. 3, 268 S. W. 64), although, in view of the evidence, we do not deem it necessary to hold the instruction erroneous on that ground.

However, by the use of the phrases in the instruction, *"at the time he committed the act charged in the indictment,"* and *"at the moment he killed John C. Deskin as charged against him,"* the jury were told that defendant. if he was not insane, was guilty of murder in the first degree, for the indictment charged him with murder in that degree only. The use of the phrases in the instruction constituted error (State v. Jordan, 306 Mo. 3, 268 S. W. 64), for the evidence justified an instruction on murder in the second degree. The instruction assumed that defendant, if guilty, was guilty of murder in the first degree. [State v. Hersh, 296 S. W. 433.] It is said that this instruction was approved in State v. Duestrow, 137 Mo. 44, 38 S. W. 554, 39 S. W. 266, but a reading of that case advises that the instructions are not identical and that the words *"as charged against him"* are. not found in the Duestrow case instruction.

III. Instruction 10 is said to be erroneous. It reads: "The court instructs the jury that on the question of the sanity or insanity of

defendant, you will consider all the evidence offered in the case, the alleged shooting of the deceased and the attendant circumstances, the life, conduct and habits of the defendant as well as his mental capacity and perverseness, if any, from his birth up to the present time, to determine whether or not the defendant was of sound mind or unsound mind *at the time of the commission of the crime charged."*

This instruction is subject to the same criticism as the one treated in the preceding paragraph of this opinion. It assumes that defendant, if not insane, was guilty of the crime charged, to-wit, first degree murder. [State v. Meininger, 306 Mo. 675, 268 S. W. 71; State v. Mills, 272 Mo. 526, 199 S. W. 131.]

IV. Instruction S-11 directs a verdict of guilty upon a finding that defendant *committed the crime as charged,* unless the jury found that the defendant was insane or acted in self-defense, as defined in other instructions. The crime charged was murder in the first degree. This instruction directed the jury to find defendant guilty of murder in the first degree, if he was not insane or if he did not act in self-defense, thus directing the jury to cast aside and to ignore other instructions based on evidence tending to show that defendant was guilty of lesser degrees of felonious homicide than murder in the first degree.

This instruction also follows the form set forth in State v. Duestrow, 137 Mo. 44, 38 S. W. 554, 39 S. W. 266. In the Duestrow case, however, the verdicts were predicated on first degree murder or acquittal only. In State v. Baker, 246 Mo. 357, 152 S. W. 46, the instruction on this subject also followed the Duestrow case, but seemingly certain changes were made in the verbiage of the instruction so as to permit the jury to consider the various grades of homicide as developed by the evidence. In any event, we think the instruction in this case constituted error.

V. Instruction S-12 is challenged. It peremptorily tells the jury that if they find defendant sane and find that he did not act in self-defense, *you will find the defendant guilty as charged in the information.* We need not repeat what we have previously herein said on this subject. Suffice it to say that, unless they acquitted defendant, they were directed to find him guilty of murder in the first degree. This instruction also ignored other instructions authorizing the jury to find him guilty of a lesser grade of homicide. We are unable to elaborate upon the discussion or reasoning on this subject found in State v. Speyer, 207 Mo. 540, 106 S. W. 505, where the identical question was determined. [See also State v. Davis, 12 S. W. (2d) 426.]

VI. Defendant complains of Instruction S-15, reading: "The jury are instructed that the testimony by the physicians and experts who testified in this case is to be taken or considered by the jury like the evidence of other witnesses who testified in the cause; and the opinions on questions of insanity which have been given by medical experts are proper testimony before you, subject to the same rule of credit as the testimony of other witnesses, and are not conclusive on the jury. These opinions neither establish nor tend to establish the truth of the facts upon which they are based. Whether the matters testified to by the witnesses in the cause as facts are true or false, are to be determined by the jury alone, and you must also determine whether the facts and matters stated and submitted to the experts in the hypothetical question are true in fact, and have been proven in the case."

We think the instruction constituted prejudicial error. By the phrase, *and are not conclusive on the jury,* which refers to the opinions of medical experts on the question of insanity, the jury were told in effect that they were at liberty to consider or to refuse to consider the testimony of medical experts, notwithstanding the instruction told them that the testimony of physicians and experts is to be taken or considered like the evidence of other witnesses, and that, on questions of insanity, it was subject to the same rule of credit as the testimony of other witnesses. The phrase referred to is probably correct as an abstract proposition of law, but, as it carries the idea of "may," it is dubious, and probably confused the jury. If it did so, it was prejudicial. [High v. Railroad, 318 Mo. 444, 300 S. W. 1102.]

Moreover, the instruction told the jury that the opinions of medical experts *on questions of insanity* . . . are not conclusive on the jury. Defendant's medical expert was the only expert that testified that defendant was insane. The State's experts testified that defendant was sane. It may be hypercritical, but if comment and caution are to be indulged in, the instruction should leave no room for doubt as to meaning that it referred to experts testifying as to both the *insanity* and *sanity* of defendant. However, the foregoing discussion is aside the question, for this court en banc has lately ruled that instructions of this nature are erroneous as a comment on the evidence. [Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84. See also Spencer v. Railroad, 317 Mo. 492, 297 S. W. 353.]

VII. Defendant contends that the evidence did not justify an instruction relative to first degree murder. It is necessary, therefore, that we summarize the evidence in that regard. It is the theory of defendant that his acts and the surrounding facts and circumstances, immediately preceding the shooting of Deskin, show that violent passion was engendered in defendant by being provoked to it,

that is, by the unjust accusation that he diverted the funds of the club to his personal use. The evidence shows that defendant knew nothing of the meeting until he was informed of it a few minutes before he appeared there. He entered the room apparently calm and normal. It was only when Deskin reached the point of the charge of defalcation of the club's funds that defendant was seen to turn pale, to arise to his feet, exclaiming, "It is a damnable lie," and to begin shooting. The foregoing facts and circumstances certainly justified an instruction on second degree murder, and the trial court did not err in submitting such issue to the jury. An intent to murder cannot be imputed to defendant because he unlawfully carried concealed an automatic pistol (State v. Lewis, 273 Mo. 518, l. c. 531, 201 S. W. 80), and, consequently, the possession of the automatic by defendant does not of itself tend to show deliberation. The testimony of State's witness Fisher, that defendant, on inquiry as to why he shot Deskin, replied, "Well, he lied on me," tended to confirm the theory that defendant was provoked to violent passion by an insult.

However, there were other facts and circumstances in evidence which permitted the jury to find the element of deliberation, necessary to convict one of first degree murder. They may be thus epitomized. To the time of the audit, Deskin and defendant appeared to be warm friends and worked together, but, during the audit, Deskin voted in the meetings of the club in harmony with those opposed to the management of defendant. One Bales testified that, a few days previous to the homicide, Deskin was playing pool at the "Ivanhoe Lodge Masonic Building," when defendant entered. Deskin, upon observing defendant and without saying a word, placed his cue in the rack and departed. He then heard defendant say, "I will get that fellow yet," but the remark was not directed to the witness, just generally. Witness knew Deskin and Warren only by sight.

Witness Elder, a detective, interviewed defendant and testified, in substance, that he did not then know the name of the man shot, and that he asked defendant why he shot this man, and defendant replied that they had been hounding him and accusing him of swindling them out of $65,000 or $70,000, and that they were going to get his job and he meant to get even; that defendant then asked "whether this man was dead yet," and witness answered, "I think he is." Defendant then said, "Well, if he isn't, let me go down and finish him up." Witness Elder admitted that in Kansas he pleaded guilty to an offense under the name of William Walker, alias Bradley.

A witness for defendant, a Mr. Weiss, testified, on cross-examination, that in October, 1924, defendant said to him that he had received a telegram from his cousin, J. B. Warren, in which he (defendant) was accused by J. B. Warren of having gotten hold of property in an illegal manner, and that he knew that his cousin was trying to

take this property away from him, and that defendant then said: "And just as sure as he does, why I will kill him."

We need not discuss the separate items in the foregoing summary or determine that any separate item was sufficient in itself to develop an inference of deliberation. We say nothing more in that regard than that the proof adduced in the record was sufficient to authorize an instruction on first degree murder. It follows that the court did not err in giving to the jury an instruction on murder in the first degree.

VIII. An assignment of error reads: "The court erred in failing to define the term 'just provocation' as that term is used in Instruction S-1, and in failing to instruct the jury as to the provocation engendered by insults, opprobrious epithets and insulting gestures which will reduce a killing from first to second degree murder."

The record shows that the trial court submitted the usual instructions as to first degree and second degree murder, which seem unassailable. The court also defined deliberation, and in doing so said, "but it means an intent to kill executed by the defendant in a cool state of the blood in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose, and not under the influence of a violent passion suddenly aroused by some lawful or just cause or provocation." It is "just provocation," as used in this instruction, that defendant submits should be defined. The jury were advised with respect to the elements of murder in both the first and second degrees. The defendant did not offer instructions attempting to define "just provocation," and the "provocation engendered by insults, opprobrious epithets and insulting gestures." The use of the words, "lawful or just cause or provocation," was invited by defendant, for he uses the words, "passion caused by lawful provocation," in his Instruction D-5 given by the court. [State v. Tedder, 294 Mo. 390, 242 S. W. 889.]

However, in State v. Ballance, 207 Mo. 607, l. c. 617, 106 S. W. 60, the court said that the concept of an instruction was correct which advised the jury, "that if the defendant shot and killed Copeland, while he, the defendant, was in a violent passion suddenly aroused by opprobrious epithets or abusive language then such killing was not deliberate, but although such killing was not deliberate, yet if it was done wilfully, premeditatedly and of malice aforethought as those terms had been already explained in the other instructions, the killing would be murder in the second degree." The court could with propriety have given such an instruction. Where the facts justify such an instruction, it is the duty of the court to give it, when requested in writing.

In defining deliberation, we do not think that the words "just" or "lawful" should be used in connection with provocation where the evidence develops several degrees of homicide, or other than first-degree murder. The words "lawful" and "just" convey to the jury that they must find that defendant deliberately killed, unless the acts of the deceased rendered the killing justifiable or excusable homicide, for "just" and "lawful" denote justification and excuse. [See State v. Wilson, 98 Mo. 440, 1. c. 448, 11 S. W. 985.]

As prejudicial error obtains, the judgment is reversed and the cause remanded. *Henwood* and *Cooley, CC.*, concur.

PER CURIAM:—This cause coming into Court en Banc, the foregoing opinion of DAVIS, C., in Division Two, is adopted as the decision of the court. All of the judges concur.