THE STATE v. SAM MCCRACKEN, Appellant.—108 S. W. (2d) 372.

Court en Banc, July 30, 1937.

W. I. *Mayfield* and *Phil M. Donnelly* for appellant.

*Roy McKittrick,* Attorney General, and *J. E. Taylor,* Assistant Attorney General for respondent.

COOLEY, C.—Appellant was convicted in the Circuit Court of Webster County, on change of venue from Camden County, of murder in the first degree for the killing, on October 6, 1934, of Jim Colvin. He was sentenced, in accordance with the verdict of the jury, to life imprisonment in the penitentiary and has appealed. Omitting reference to pages of the bill of exceptions we adopt the statement of facts given in the State's brief as sufficiently outlining the facts, for most purposes of the appeal, as follows:

"At the time of the alleged killing appellant lived on a farm in Camden County, Missouri, on the south side of a county road which runs east and west. His barn was on the north side of said road and the deceased, who rented part of appellant's farm, lived in a tenant house about 100 yards due south of appellant's home. North of the barn was a lane leading down to a cornfield where deceased had been hauling fodder the day before he was killed. This lane ran north for some distance and turned east.

"On the morning deceased was killed he left his home and came by the barn where his son was harnessing a team and walked on down the lane toward the field where they had been hauling fodder. About ten or fifteen minutes afterwards his son heard four shots. A number

of witnesses also heard the four shots and the deceased holloaing in a distressful voice as if in pain. A number of persons arrived at the scene of the killing shortly after the shots had been fired and found the deceased lying in the lane on his right side. He had been shot just back of the center of the left shoulder and his nose and upper jaw were shot off. From the body there was blood leading on down the lane for about 60 steps to where there was a small hole in the ground. In the hole there was found a piece of cap, identified as deceased's, blood, flesh, teeth, a number four and number two shot and gunshot wadding. A short distance from the hole in the lane there was a 12-gauge shotgun which had two empty shells in it and a gunny sack partly full of corn. The gun was immediately recognized as one belonging to appellant. On the right or south side of the lane, opposite the hole, there was a walnut tree and a small hackberry tree; there was blood spattered on the hackberry tree and shot in the walnut tree. On the left or north side of the lane, opposite the hole, there were some posts lying between the lane and fence and across the fence and about forty feet in the field there were a number of fodder shocks. Between the fodder shocks and the walnut and hackberry tree, there was found gunshot wadding scattered across the lane. A number of witnesses testified that the wadding was in line from the corn shocks, north of the fence, to the hackberry and walnut trees on the south side of the lane. It was foggy the morning of the murder and there had been a heavy dew, which wet the dirt and footprints were discernible over towards the fodder shocks and there was dirt on a wire of the fence within five or six feet of where the gun wadding was lying inside the field.

"The appellant, the day before the killing, bought four 12-gauge number two shotgun shells, which were the same kind as the two empty shells found in appellant's gun.

"The Sheriff of Camden County testified that after he arrived at the scene of the killing, at about eight-thirty A. M., he learned that the defendant owned the gun found in the lane, and went to his home and searched the premises and then went out different roads in search of appellant, and finally found him in a field three miles from the scene of the crime. Appellant admitted to the sheriff that he shot deceased, but said he did it in self-defense.

"Morgan Moulder, Prosecuting Attorney of Camden County at the time of the killing, testified that the appellant admitted shooting the deceased twice as he was coming toward him with a white-handled long, keen-bladed knife. He further testified that he was present when deceased was searched and that there was found in his pocket a closed black-handled knife. He also testified that appellant came to his office some time before the killing and wanted to put deceased off his farm and he advised appellant that he did not have the

authority to do so and appellant became angry and stated he had a double-barreled shotgun which he could use as his own law.

"Appellant testified in his own behalf that at the time he shot deceased that deceased was coming toward him with an open knife in his hand, and that he shot him to save his own life. He further testified that deceased had threatened him on several occasions, and on one occasion deceased had chased and struck at him with an axe."

Such further facts as may be necessary will be given in the course of the opinion.

Appellant, though represented by able counsel below, has filed no statement or brief in this court. We must look to his motion for new trial for the grounds on which he seeks reversal.

■ The first contention is that the court erred in not sustaining defendant's challenge, for cause, of a prospective juror, Thomas, one of the panel of thirty from which the trial jury was to be selected. Thomas testified on *voir dire* examination that when he had first heard of the killing he had formed an opinion, based solely, however, upon what he had been told by persons who, themselves, did not purport to know any of the facts and, perhaps, from having read about the killing—in other words, upon rumor and newspaper reports. He further said, in answer to questions by counsel and by the court that he could and would disregard any impression so formed in his mind and determine the issues solely upon the evidence and the court's instructions. He further said that he could not recall what his original opinion or impression was and, in substance, that he had no opinion as to defendant's guilt or innocence. Under our holding in State v. Wampler, 58 S. W. (2d) 266, where we discussed a similar contention, the ruling of the trial court denying the challenge for cause was correct. [See, also, State v. Stanton, 68 S. W. (2d) 811; State v. Kauffman, 335 Mo. 611, 73 S. W. (2d) 217.]

■ It is contended that the court erred in permitting Mr. Moulder, an attorney assisting in the prosecution, to make to the jury the opening statement of facts which the State expected to prove. Mr. Moulder was prosecuting attorney of Camden County when the prosecution was begun and filed the information. We gather that he had gone out of office when the case was tried but had been retained to assist in the prosecution. There was no error in this ruling of the court. The point was decided adversely to appellant's contention in State v. Stark, 72 Mo. 37, followed in State v. Taylor, 98 Mo. 240, 11 S. W. 570, and in State v. Coleman, 199 Mo. 112, 120, 97 S. W. 574. To same effect see State v. Boyer, 232 Mo. 267, 277, 134 S. W. 542.

■ The next assignment of error in the motion for new trial is that the court erred "in admitting irrelevant and illegal testimony

over the objections and exceptions of the defendant . . . as follows, to-wit:" Then follows extracts from the testimony of ten or a dozen witnesses, consisting of questions, objections thereto, the rulings of the court and the answers of the witnesses to questions to which objections had not been sustained, with no statement in the motion for new trial of any specific ground or reason for the complaint of error. In State v. Lonon, 331 Mo. 591, 56 S. W. (2d) 378, 381-2, we held a similar assignment in a motion for new trial insufficient under the statute. Adhering to that ruling, we shall not discuss in detail the evidence referred to or the court's rulings in admitting the same. We have, however, carefully read the evidence as preserved in the bill of exceptions and find no prejudicial error in the rulings complained of.

Contention is made in the motion for new trial that there was no evidence of deliberation and that the evidence was therefore insufficient to authorize submission of murder in the first degree and to sustain the verdict for that grade of murder. To this we cannot agree. Where a homicide is intentionally committed with a deadly weapon used upon a vital part of the body and there is no witness to the occurrence, murder in the second degree is presumed in the absence of evidence tending to show a different grade of offense or that such killing was justifiable or excusable. [State v. Snow, 293 Mo. 143, 238 S. W. 1069; State v. Eason, 322 Mo. 1239, 18 S. W. (2d) 71.] But murder in the first degree may be shown by circumstantial evidence. "Premeditation, . . . deliberation, the cool blood, may all be inferred from the circumstances of the homicide." [State v. Cade, 326 Mo. 1132, 1137, 34 S. W. (2d) 82, 83.]

In the case before us there was evidence that there existed a feeling of hostility between defendant and the deceased. Sometime before the killing the defendant had tried to have deceased put off the place which the latter occupied as tenant and on being informed that it could not be done had said that he had a double-barreled shotgun which he could use as his own law. The day before the killing he had purchased shells for his gun. Deceased was killed with that gun and evidently those shells were used. The killing occurred in a narrow lane, running, at that place, approximately east and west. On the north side thereof was a wire fence, a short distance north of which, in the field, were the fodder shocks above mentioned. One gun wad was found just north of the fence and two or three in the lane between that point and the bloody hole in the ground which we have mentioned. The walnut tree in which some shot were found was a few feet south of said hole and the shot that penetrated it had come from a northerly direction. There was fresh dirt on a wire of the fence, about in line with the gun wads, the hole in the ground and the walnut tree, as though someone had climbed over the fence at

that point. The circumstances indicated that one or two shots had been fired from a point north of the fence, probably in the vicinity of the fodder shocks. There were four shots fired. The first two were close together, possibly a second or so apart, then there was an interval of a minute or more between the second and the third shots. The third and fourth shots were very close together, so close that one witness could hardly distinguish the interval between them. Between the first and third shots Colvin was heard to cry out "in a distressful voice," as though in pain. After the third shot there was no outcry.

From the description of the wounds found on the deceased it appears that the shot which wounded him in the body must have come from his left and apparently somewhat from behind, since the wound is described as being "back of the center" of the left shoulder. The hole in the ground is described as being two or three inches in diameter and going into the ground "at an angle"—one witness said an angle of about forty or forty-five degrees. About it there was a pool of blood and in it a small piece of Colvin's cap bill, blood, flesh, teeth and gunshot wadding. Clearly the shot (or shots, it may have been the last two, which were very close together), which made that hole, tore off part of deceased's face and carried pieces of flesh, teeth, etc., into the ground. Deceased must have been then lying on the ground and with his head close to the ground, not only *hors de combat* but mortally wounded, because the doctor who later examined the body testified that either wound would have caused death. The description of the wound in the face, according to the State's evidence, indicates that when the shot which made it was fired Colvin's head was sidewise to, rather than facing, the gun. The shot was across the upper part of the face, carrying away the nose, upper front teeth, etc.

Defendant testified that he only fired two shots and that the *first* shot struck Colvin in the face; that Colvin was directly facing and was advancing on him with an open knife in his hand, and was near; that Colvin then partly turned and that he, defendant, fired the second shot as quickly as he could (fearing for his life), meaning to hit Colvin in or about the stomach, but in his haste and excitement, hit him, as he turned, about the left shoulder; that Colvin at no time fell and that when he last saw him he, Colvin, was walking away in the direction of the place where his body was later found. The question of the truth of that testimony was of course for the jury. But in passing on the question now under discussion it may be observed that it is irreconcilable with the testimony of half a dozen or so unimpeached witnesses who described the wound in deceased's face and the shot hole in the ground with its gruesome contents. If that shot had been fired by defendant when Colvin was near, and

facing him, as defendant testified, it must have stopped, probably killed, Colvin, instantly, and could not have made that bloody hole in the ground, carrying into it portions of Colvin's face, teeth, gunshot and wads, etc. In view of the facts and circumstances we have sketched there was sufficient evidence to justify the finding by the jury of the deliberation necessary to constitute murder in the first degree. The jury could have found, probably did find, that when defendant fired the first shot he was in the field, north of the fence, to the left of and perhaps somewhat behind Colvin, who was in the lane, and that he followed up that murderous assault by shooting Colvin again, at close range, when the latter lay helpless on the ground.

In the motion for new trial the contention is advanced that the definition in the instructions of the term "deliberately," distinguishing murder in the first degree from murder in the second degree, was prejudicially erroneous. The court defined the term thus:

" 'Deliberately' means considered and reflected upon. An act committed in the cool state of the blood, with a conscious purpose to kill, and not under the influence of a violent passion suddenly aroused by some lawful or just cause of provocation, is committed deliberately."

The criticism of the instruction is that "the court erred in using the words 'just' or 'lawful' in connection with provocation for the reason that the evidence showed more than one degree of homicide, and also the justification . . . on the ground of self-defense, and the court instructed on both first and second degree murder." The court also instructed on self-defense.

This contention is doubtless based upon what we said in State v. Warren, 326 Mo. 843, 856, 33 S. W. (2d) 125, 130, (15), as follows:

"In defining 'deliberation,' we do not think that the words 'just' or 'lawful' should be used in connection with provocation where the evidence develops several degrees of homicide, or other than first degree murder. The words 'lawful' and 'just' convey to the jury that they must find that defendant deliberately killed, unless the acts of the deceased rendered the killing justifiable or excusable homicide, for 'just' and 'lawful' denote justification and excuse."

In the Warren case the assignment of error with which the court was dealing was that the trial court had erred in failing to define the term "just provocation" as used in the instruction defining deliberation, "and in failing to instruct the jury as to the provocation engendered by insults, opprobrious epithets and insulting gestures which will reduce a killing from first to second degree murder." The court, in disposing of that assignment of error said:

"The defendant did not offer instructions attempting to define

'just provocation,' and the 'provocation engendered by insults, opprobrious epithets and insulting gestures.' The use of the words, 'lawful or just cause or provocation,' was invited by defendant, for he uses the words, 'passion caused by lawful provocation,' in his Instruction D-5 given by the court.''

After referring to and quoting from an instruction approved in State v. Ballance, 207 Mo. 607, 106 S. W. 60, 63, which, the court said, might appropriately have been given in the case before it, the court made the observation relative to the use of ''just'' or ''lawful'' which we have quoted above. The Warren case was not reversed because of the instruction defining deliberation. The court did not say the instruction was reversibly erroneous, and we think the quoted statement was somewhat in the nature of *obiter dictum* since the real point at issue was different and was decided on other grounds. We are inclined to think, also, that we went somewhat too far in intimating that the words '' 'just' or 'lawful' '' should in no case be used in connection with ''provocation,'' where, under the evidence, a grade of felonious homicide other than first-degree murder could be found, on the suggested theory that those words ''convey to the jury that they must find'' that the killing was deliberate unless legally justifiable or excusable. Those words, so used, are not designed, nor, do we think, reasonably likely, to be understood by the jury as referring to *legal justification or excuse for the homicide*, as, for example, in the instant case, self-defense, or as in the Warren case, insanity. They refer to the ''cause of provocation,'' which negatives the *deliberation*, the ''cool state of blood,'' necessary to constitute murder in the first degree as distinguished from murder in the second degree or manslaughter. The terms ''just'' or ''lawful'' in connection with provocation have been used for many years in defining ''deliberation'' in murder cases. Those terms, as so used, and the cause of provocation which will reduce the homicide to a lower grade than murder in the first degree are discussed in State v. Ellis, 74 Mo. 207, a case often cited, wherein, at page 219 ''just cause of provocation'' is said to be that ''which will constitute the homicide murder in the second degree, as distinguished from a lawful provocation, which will reduce it to manslaughter.'' In no case we have found, except the Warren case, does it appear to have occurred to the court that the words ''just'' or ''lawful,'' used in connection with ''provocation'' in defining ''deliberation,'' were calculated to convey the idea that the homicide must be found to have been committed *deliberately*, therefore murder in the first degree, unless found to have been legally justifiable or excusable.

In State v. Bobbst, 269 Mo. 214, 225, 190 S. W. 257, 260, those terms were used and the instruction was approved, citing and following State v. Ellis, supra. However, in that case the defense was

insanity and the court says there was no evidence of "sudden passion or provocation." In State v. Davis, 226 Mo. 493, 126 S. W. 470, the trial court instructed on murder in the first and second degrees and on manslaughter. This court said, 226 Mo. l. c. 515:

"This court has time and again approved the definition deliberately given by the criminal court in this case, to-wit, that 'it does not mean brooded over or reflected upon for a week or a day or an hour; but it means a conscious purpose to kill, formed in a cool state of blood and not under violent passion suddenly aroused by some real or supposed grievance.' "

In the Bobbst case it was contended that the instruction there given conflicted with that given and approved in State v. Davis, supra, in that it said "done in a cool state of the blood, not in a sudden passion engendered by lawful or some just cause of provocation," while in the Davis case it said, "not under violent passion suddenly aroused by *some real or supposed grievance.*" (Italics ours.) The court in the Bobbst case said,

"If it can be said that there is any material difference in the meaning of quoted portions of the two definitions, it appears that the definition given by the court of his own motion in the case at bar is somewhat wider in scope, and therefore of benefit rather than detriment to the defendant. We are inclined to the opinion that the instruction complained of is in better form and more accurate than the one quoted in State v. Davis, supra, and that the court did not err in giving the same."

In State v. Barbata, 336 Mo. 362, 80 S. W. (2d) 865, we had occasion to consider this question and to notice State v. Warren, supra. In the Barbata case we distinguished the case there before us from the Warren case, pointing out that there was no evidence of other than first-degree murder unless the homicide was excusable because of insanity, and that the form of instruction complained of is proper where there is no evidence of sudden passion or provocation such as to reduce the grade of homicide from first-degree murder to a lower grade of offense, citing State v. Ellis, supra, and a number of other cases. See, also, State v. Hershon, 329 Mo. 469, 45 S. W. (2d) 60, wherein WHITE, J., in a separate concurring opinion explains the holding in State v. Sharpe, 326 Mo. 1063, 34 S. W. (2d) 75, 79. In the Sharpe case the condemnation of the definition of deliberation was on a different ground.

We might distinguish the case before us from State v. Warren, supra, on the ground that in the instant case there was no testimony tending to show or to authorize a finding of sudden passion engendered by just or lawful cause of provocation. There was no witness to the killing other than the defendant, and his testimony tended only to show self-defense. But under the State's evidence the court

was required to submit murder in the second degree, which it did. That being true the question arises, was the definition of the term "deliberately" as used in the instruction submitting first-degree murder, prejudicially erroneous? We think not. It defines "deliberately" as meaning "considered and reflected upon" and then says that "an act committed *in the cool state of the blood, with a conscious purpose to kill,* and not under the influence of a violent passion suddenly aroused by some lawful or just cause of provocation, is committed deliberately." (Italics ours.) That definition, as a legal proposition, we think is well enough. It does not purport to deal with the question of self-defense—*justification* for the killing—which was submitted by another instruction, and we are satisfied it could not have been understood by the jury as having any reference to the issue of self-defense, or as requiring a finding that the homicide had been committed deliberately and in cold blood unless justifiable on the ground of self-defense. Doubtless it is well enough, where the evidence calls for or suggests it, for the court to instruct the jury as to the character of facts which, if found, will amount to just or lawful cause of provocation such as to reduce the homicide to a lower degree than murder in the first degree, if not justifiable or excusable. No such instruction was requested nor did the evidence call for it in this case.

There are some other assignments of error in the motion for new trial which we deem it unnecessary to discuss. We have examined them and find no prejudicial error therein. Appellant was given a fair trial and the verdict is supported by substantial evidence. We find no prejudicial error in the record. The judgment of the circuit court is affirmed.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the Court en Banc. All the judges concur.